UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No.

| | |
|---|---|
| BETH ARBUCKLE,<br><br>        Plaintiff,<br><br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>        Defendant. | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Beth Arbuckle ("Plaintiff" or "Ms. Arbuckle") brings this action for violation of Title I of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C.§ 12101, *et seq*., and the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq*., and alleges the following:

**PARTIES**

1. Ms. Arbuckle is an adult female and at all relevant times resided in Fort Mill, South Carolina.

2. Wells Fargo Bank, N.A., ("Defendant" or "Wells Fargo") is an entity formed under the laws of South Dakota, registered to do business in North Carolina, with an office located at 401 South Tryon Street, 28th Floor, Charlotte, North Carolina 28202, where Defendant was employed. According to filings with the North Carolina Secretary of State, Defendant's principal office is located at 101 N. Phillips Avenue, Sioux Falls, South Dakota, 57104. Defendant employed Ms. Arbuckle during the events giving rise to this action.

## JURISDICTION AND VENUE

3. This Court has original jurisdiction under 28 U.S.C. § 1331 over Plaintiff's claims under the ADA and FMLA, because the claims arise under the laws of the United States.

4. This Court has personal jurisdiction over Defendant because Defendant conducts business in Charlotte, North Carolina, which is located within this judicial district

5. At all relevant times, Defendant was an "employer" within the definition of ADA, 42 U.S.C. § 12101, *et seq*. (specifically, 42 U.S.C. § 12111(5)) on the basis that it employs more than 15 employees.

6. At all relevant times, Plaintiff was an "employee" of Defendant within the definition of ADA, 42 U.S.C. § 12101, *et seq*. (specifically, 42 U.S.C. § 12111(4)).

7. At all relevant times, Defendant was, and is, an "employer" within the definition of FMLA, 29 U.S.C. § 2611(4)(A) on the basis that it employs more than 50 employees.

8. At all relevant times, Plaintiff was an "eligible employee" within the definition of FMLA, 29 U.S.C. § 2611(2)(A), on the basis that Defendant employed Plaintiff for at least 12 months, and Plaintiff performed at least 1,250 hours of service for Defendant.

9. At all times relevant to this action, Defendant possessed and exercised the power and authority to direct, control and supervise the work performed by Ms. Arbuckle.

10. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Plaintiff was hired to work in this district and Defendant conducts business in this district.

## ADMINISTRATIVE EXHAUSTION

11. Plaintiff satisfied her obligation to exhaust her administrative remedies by timely filing a Charge of Discrimination against Defendant with the United States Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on disability and retaliation.

12. Plaintiff filed a charge with the EEOC on July 18, 2023.

13. The EEOC issued a Notice of Right to Sue on September 13, 2024. Plaintiff timely brings this action within ninety (90) days of her receipt thereof.

14. Plaintiff has satisfied all private, administrative, and judicial prerequisites to the institution of this action.

## GENERAL ALLEGATIONS

14. Ms. Arbuckle has been employed by Defendant and its predecessors for over twenty (20) years, and she currently holds the title of Senior Finance Manager, SVP.

15. In March 2020, employees for Defendant shifted to remote work as a result of the COVID-19 pandemic.

16. From March 2020 and through 2021, Ms. Arbuckle successfully worked remotely from home, and she was able to fully perform the required duties of her position while working remotely.

17. During Defendant's remote work mandate, Ms. Arbuckle was diagnosed with retinitis pigmentosa, a disease of the eye that causes retina cells to break down over time, causing vision loss.

18. Additionally, during 2021, Ms. Arbuckle was diagnosed with lupus.

19. Despite her retinitis pigmentosa and lupus diagnosis, Ms. Arbuckle continued to fully and successfully perform her job while working from home.

20. In 2022, Defendant announced that its remote work-from-home policies had changed, and that all employees would now be required to report in person to the office for three days per week.

21. After Defendant announced this policy change, Ms. Arbuckle informed her then-manager, Paul Foody ("Mr. Foody") that she would be seeking a reasonable accommodation to continue to work from home after the new in-office policy went into effect.

22. Thereafter, in March 2022, Ms. Arbuckle requested to continue to work from home as a reasonable accommodation due to her retinitis pigmentosa, as her disability affects her sight and her ability to drive to and from the office, and the fluorescent lights in the office and constant lighting changes throughout the office make it more difficult for her eyes to adjust.

23. In March 2022, Ms. Arbuckle's duties included leading a team of 20+ team members, and forecasting loans for CIB, CB, WIM and CSBB. She was reporting to Mr. Foody who reported to Marc Winneford, the head of Corporate FP&A at the time. Ms. Arbuckle was to be re-organized under Commercial Banking Finance and would have forecasting for both deposits and loans.

24. In early June 2022, Ms. Arbuckle's team was moved from Mr. Foody's supervision, and she then began to report to LeRoy Davis ("Mr. Davis"). Mr. Davis was the CFO for Commercial Banking and reported directly to CFO Mike Santomasimo.

25. Ms. Arbuckle spoke with Mr. Davis regarding her formal request for accommodation to allow her to continue to work from home, and that Human Resources had approved her to work from home in the interim.

26. On or about May 23, 2022, Ms. Arbuckle followed up on her request for accommodation as it had not yet been approved. In response, Ms. Arbuckle was informed that she would be contacted in the next few days, and that any pending telecommute requests should not affect her.

27. At the end of June 2022, Human Resources formally approved Ms. Arbuckle's accommodation to continue to work remotely from home.

28. During the approximate thirteen (13) weeks that it took for Defendant to approve Ms. Arbuckle's accommodation request, her name appeared weekly on a list of employees who were not adhering to Defendant's new policy of reporting in person to office three days per week ("Non-Compliance Report"). This Non-Compliance Report was emailed to Mr. Davis, Ms. Arbuckle's peers, and upper management. The Non-Compliance Report was often a topic of discussion in meetings, and an employee's name being included on the report was generally perceived as a negative.

29. Additionally, in the weekly meetings with Mr. Davis' leadership team there was an agenda item for review with a Human Resources representative, Stephanie Silva ("Ms. Silva"), regarding return-to-work non-compliance, and those employees not complying were highlighted in red on the Non-Compliance Report. Managers were expected to explain why they were not compliant and what the plan was to become compliant. This included the managers discussing team members who had medical reasons for not complying, which made Ms. Arbuckle very uncomfortable. Ms. Arbuckle was embarrassed to be on the Non-Compliance Report in front of her new peers and having to defend herself.

30. Defendant made no distinction in the Non-Compliance Report between individuals such as Ms. Arbuckle who were engaged in the interactive process of receiving a reasonable accommodation and individuals who were actively not following the revised policy. Therefore, Ms. Arbuckle's inclusion on the Non-Compliance Report made it appear that she was being insubordinate, rather than working from home due to a legitimate medical need.

31. Ms. Arbuckle sent an email to accommodations management asking why her name was included on the Non-Compliance Report when they gave her the approval to continue to work remotely until her request was processed. Ms. Arbuckle received a response ensuring her that she was not being considered non-compliant. However, Defendant ignored Ms. Arbuckle's repeated requests to have her name removed from the Non-Compliance Report.

32. In June 2022, within less than a week of Ms. Arbuckle's accommodation request being approved, her team was reorganized, and she was placed under Jamey Escaler ("Mr. Escaler") who had previously been her peer. This was despite Mr. Escaler having no experience leading a finance team, an FP&A team, a forecasting team, or a treasury finance team.

33. During Ms. Arbuckle's 2022 midyear review in July 2022, Ms. Arbuckle was given an "Exceeds" rating by Mr. Davis.

34. In July 2022, Ms. Arbuckle went out on leave for an ongoing lung infection pursuant to FMLA and Defendant's Short-Term Disability policy.

35. While Ms. Arbuckle was on leave, Mr. Escaler directed her to perform work in the form of creating a business case for the reorganization of the managers under her supervision, which she did. In lieu of following Ms. Arbuckle's proposed reorganization plan, Defendant removed half of her team from her supervision and relocated them to other areas of the organization.

36. Ms. Arbuckle returned from leave in October 2022 and the reorganization was completed in November 2022. Upon her return, Ms. Arbuckle was left out of financial review meetings by Mr. Escaler, despite his assurance that he would include her, which limited her exposure to the Commercial Business Financials sector.

37. In December 2022, Ms. Arbuckle was informed that she was placed on an insider threat list when she tried to approve a team member's travel expenses. Ms. Arbuckle was told this was consistent with other team members who were on a leave of absence.

38. During Ms. Arbuckle's annual performance review in January 2023, Mr. Escaler, gave her a "Meets Expectations" rating, due to "not having enough data points" to give her a higher rating. This was a significantly reduced rating compared to her "Exceeds" rating from her review six months earlier in July 2022. There was nothing in the annual review to explain the sudden drop in her rating, or what Ms. Arbuckle needed to do to provide more "data points".

39. While Ms. Arbuckle's performance review took place in January 2023, it is well known the ratings are completed by November or December of 2022. As such, the January 2023 performance review rating would have been based upon Ms. Arbuckle's performance for the first half of 2022, plus the one to two months that she was able to work in the second half of the year following her medical leave.

40. Notably, Ms. Arbuckle received an "Exceeds" rating for the first six months of 2022, and it was Defendant who thereafter restricted her responsibilities after her return from leave by re-assigning half of her team. This also restricted Ms. Arbuckle's ability to perform her work and provide more "data points" for future reviews.

41. As a result of the "Meets Expectations" rating, Ms. Arbuckle's cash bonus was reduced, with her overall compensation being reduced by 7% ($22,500).

42. Given that Defendant bases employees' future compensation on a percentage increase on the previous year's compensation, Ms. Arbuckle will continue to feel the effects of Defendant's negative performance review long-term.

43. In May 2023, Ms. Arbuckle applied for Mr. Escaler's position after he moved into a new role, but she did not get past the Human Resources screening. This was despite Mr. Escaler telling Ms. Arbuckle he would fully support her applying.

44. In June 2023, Ms. Arbuckle was closed out of all systems. When she tried to contact the help desk, she was told they did not have Ms. Arbuckle's employee ID listed as an employee.

45. Ms. Arbuckle subsequently learned that she was removed from all systems with a terminated/leave status. She was initially told this was a widespread technology issue. However, Ms. Arbuckle spoke to several IT technicians who said they did not know of any widespread issues. Another manager told Ms. Arbuckle that the day and time her system was revoked was the same day and time team members from layoff waves for that month were terminated. Another technology specialist noted that Ms. Arbuckle was on an official termination/leave feed that he could not override.

46. From 2022 through 2024, Defendant rolled out new manager quarterly training sessions. Ms. Arbuckle attended the first one in person and Ms. Silva said to Ms. Arbuckle, "Oh Beth, I didn't expect to see you here."

47. During another manager training session, Ms. Arbuckle was put in a virtual training session, then in-person, and then put back in virtual again. Ms. Arbuckle assumed everyone was in the virtual session. When she asked why it was virtual when the email communication from Mike Santomasimo (CFO) said they were to be in-person, Ms. Arbuckle was told this was because she was listed as "remote" on internal team works. This is despite Ms. Arbuckle's accommodation allowing for flexibility in her being able to work remotely, not 100% remote, and she asked her manager repeatedly to have this corrected.

48. In September 2023, a CB finance team member left Defendant for another opportunity. As a result, his direct reports were moved under Ms. Arbuckle doing pricing and profitability. At the time, this seemed like a great opportunity for Ms. Arbuckle to expand her role and utilize her skills. However, the role was not what was initially represented to Ms. Arbuckle. She asked multiple times for clarification about the team's mandate, but no one could provide it to her. It appeared that the team was being wound down as only one of the five team members was in a hub, and the one who was terminated was not replaced. Ms. Arbuckle's understanding from conversations with her manager is that the remaining members of the team will be terminated by March 2025.

49. On or about December 12-13, 2023, during an in-person CB Finance FP&A meeting, the new CFO, Steve Macko ("Mr. Macko"), came by for a session and he noticed one of the team members was attending virtually when it was to be in-person. Mr. Macko yelled at the Finance Senior Manager, Heather Boucher ("Ms. Boucher"), in front of everyone demanding to know why the team member did not attend in person (he is located in Florida). Such questioning resulted in the team member's medical issue being disclosed in front of everyone. Several other team members commented on this being inappropriate.

50. In mid-December 2023, Human Resources stated they did not have records for Ms. Arbuckle's accommodation request and that she needed to submit it again. However, Ms. Arbuckle could see that her accommodation was online, and therefore, Human Resources should have it. Ms. Arbuckle asked why Human Resources could not contact accommodations management to get this information, but she received no answer.

51. From January 2024 until March 2024, Ms. Arbuckle was out on medical leave due to respiratory complications after she contracted COVID.

52. In May and June 2024, Mr. Macko set up meetings regarding pricing and profitability. Ms. Arbuckle repeatedly asked Ms. Boucher to include her in those meetings to be effective in her new capacity. However, Mr. Macko did not include Ms. Arbuckle but included Ms. Arbuckle's direct report, Robin.

53. During mid-year reviews in July 2024, Ms. Boucher called Ms. Arbuckle and stated she had been in a review session with Mr. Macko. Ms. Boucher indicated she named Ms. Arbuckle as a potential and ready replacement for her position. However, Ms. Boucher was challenged as to whether Ms. Arbuckle "wanted" it or not. Ms. Boucher indicated "yes" as she had known Ms. Arbuckle and worked with her for years.

54. Ms. Boucher also informed Ms. Arbuckle that Mr. Macko wanted to know the reason why another employee named Philippe had an accommodation and specifics about his disability. Ms. Arbuckle told Ms. Boucher she did not know the specifics, and she did not think this was an appropriate question. Notably, Mr. Macko pushed back on Philippe in talent discussions because Mr. Macko does not see Philippe when he is in the San Francisco office. Ms. Arbuckle told Ms. Boucher she submitted Philippe's mid-year review to be sure he was visible to leadership when Mr. Macko was in the office.

55. On September 16, 2024, Ms. Arbuckle spoke with Ms. Boucher about events that had transpired over the last year. Ms. Boucher stated that when Ms. Arbuckle was coming back from leave, Mr. Macko asked her if she wanted Ms. Arbuckle to come back. Ms. Boucher said "yes" and thought it was odd that Mr. Macko was indicating he could cause Ms. Arbuckle to not return. Ms. Boucher also indicated that Mr. Macko made comments about team member Philippe and why he was in the office sometimes and not others if he needed an accommodation. Additionally, Ms. Boucher recently asked for a temporary remote status for another employee on

the team, and Mr. Macko denied the request as too many team members had accommodations. Such actions demonstrate Defendant's unwillingness to afford accommodations for employees with disabilities.

56. Ms. Arbuckle therefore believes and avers that Defendant discriminated and retaliated against her due to her disability and requesting FMLA leave

57. Defendant's discriminatory and retaliatory actions have caused Ms. Arbuckle considerable hardship and emotional impact, further increasing her damages.

## COUNT I

### Violation of Americans with Disabilities Act of 1990, as Amended
### 42 U.S.C.§ 12101, et seq

58. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint.

59. Ms. Arbuckle is a "person" and an "employee," and Defendant is an "employer" and a "covered entity" as those terms are defined at 42 U.S.C.§ 12101, et seq.

60. At all relevant times, Plaintiff was a qualified individual with an actual or perceived disability. Prior to Plaintiff's request for accommodation pertaining to her disability, Plaintiff was performing her job remotely from home at a level that met and exceeded her employer's legitimate expectations.

61. Plaintiff notified Defendant of her retinitis pigmentosa, a disease of the eye which causes retina cells to break down over time, causing vision loss. In March 2022, Ms. Arbuckle requested to continue to work from home as a reasonable accommodation due to her retinitis pigmentosa, as this disability affects her sight and her ability to drive to and from the office, and the fluorescent lights in the office and constant lighting changes throughout the office make it more difficult for her eyes to adjust.

62. Plaintiff was able to perform the essential functions of her job with the accommodation of working remotely as she had done so since March 2020 when Defendant mandated employees work from home due to COVID-19. Plaintiff received an "Exceeds" rating on her 2022 midyear review, while she was working remotely.

63. While it appears that Defendant did reasonably accommodate Plaintiff's disability by approving her accommodation request to continue working remotely from home, Defendant punished Plaintiff for seeking and being granted a reasonable accommodation by placing Plaintiff on a Non-Compliance Report, leaving her out of financial review meetings in which she used to participate, having her direct reports reassigned, placing her under another manager who had previously been her peer, declining to consider her for promotional opportunities, and giving her a "Meets Expectations" rating on her 2022 end-year review, resulting in a decrease to her overall compensation. Such retaliatory decrease has resulted in an ongoing reduction in Plaintiff's compensation.

64. Defendant violated the ADA by discriminating and retaliating against Plaintiff based on an actual or perceived disability in violation of 42 U.S.C. § 12112(a).

65. The punitive actions by Defendant towards Plaintiff occurred under circumstances that raise a reasonable inference of unlawful discrimination and retaliation without a legitimate business reason.

66. Plaintiff has been damaged by Defendant's violation of the ADA as Plaintiff has suffered loss of past and future wages and benefits, loss of professional opportunities, emotional distress, and mental pain and anguish.

67. Plaintiff is entitled her attorneys' fees and costs incurred in this matter pursuant to 42 U.S.C. § 12205.

68. Plaintiff is further entitled to any and all relief permitted under the ADA, 42 U.S.C. § 12117(a), including equitable relief.

## COUNT II

### Violation of FMLA

69. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint.

70. Defendant was well aware that Ms. Arbuckle had suffered a qualifying event under FMLA.

71. Defendant retaliated against Ms. Arbuckle for taking her lawfully permitted FMLA leave under 29 U.S.C. § 2612(a)(1)(D) due to an ongoing lung infection.

72. Defendant interfered with and restrained Ms. Arbuckle from the lawful exercise of her substantive rights provided under the FMLA including, but not limited to, failing to provide the required individual FMLA notices to her and thereby preventing her from making informed decisions about her leave.

73. Plaintiff was automatically prejudiced by the lack of required individualized notice.

74. Plaintiff was further prejudiced because after she returned from her authorized FMLA leave, Defendant retaliated against Plaintiff by leaving her out of financial review meetings in which she used to participate, having her direct reports reassigned placing her under another manager who had previously been her peer, declining to consider her for promotional opportunities, and giving her a "Meets Expectations" rating on her 2022 end-year review, resulting in a decrease to her overall compensation. Plaintiff has thus suffered damages because of Defendant's unlawful conduct.

75. Defendant's violation of the FMLA, 29 U.S.C. § 2615(a)(1), by interfering with Ms. Arbuckle's lawful exercise of her rights under FMLA, and retaliating against her, was willful and/or lacking good faith.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands the following relief:

1. An Order awarding Plaintiff damages for Defendant's violation of the ADA, including backpay, front pay, lost employment benefits, and any other compensation denied or lost because of Defendant's violation of the ADA;

2. An Order awarding Plaintiff damages for Defendant's violation of the FMLA, including backpay, lost wages, employment benefits, liquidated damages and any other compensation denied or lost because of Defendant's violation of the FMLA;

3. An Order awarding Plaintiff compensatory damages for emotional distress, pain and suffering, inconvenience, and/or mental anguish in an amount to be proven at trial;

5. An Order awarding Plaintiff the costs of this action;

6. An Order awarding Plaintiff reasonable attorneys' fees;

7. An Order awarding Plaintiff pre-judgment and post-judgment interest at the highest rates allowed by law; and

8. An Order granting any other necessary or appropriate relief to which Plaintiff is entitled under the law.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury.

*/s/ L. Michelle Gessner*
L. Michelle Gessner, NC State Bar No. 26590
GESSNERLAW, PLLC
602 East Morehead Street
Charlotte, North Carolina 28202
Tel: (844) 437-7637; Fax: (980) 206-0286
Email: michelle@mgessnerlaw.com

*Attorney for Plaintiff*