**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Civil Action No. 3:24-cv-01068-FDW-SCR**

| | |
|---|---|
| BETH ARBUCKLE,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>Defendant. | **DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Federal Rule of Civil Procedure 56, Defendant Wells Fargo Bank, N.A. ("Defendant"), respectfully submits this Memorandum in Support of its Motion for Summary Judgment.

## I. INTRODUCTION

Plaintiff Beth Arbuckle ("Plaintiff") asserts claims of discrimination based on her disability and retaliation in violation of the Americans with Disabilities Act of 1990, as amended ("ADA"), and interference and retaliation in violation of the Family and Medical Leave Act ("FMLA"). The undisputed evidence establishes Defendant granted Plaintiff's request to work from home intermittently as an accommodation for her disability, When Plaintiff twice requested medical leave, Defendant granted both requests. Plaintiff continues to work for Defendant in the same role as she had when she first requested an accommodation. She continues to work from home as needed for her accommodation and has never had this accommodation denied. As set forth further below, there is no genuine issue of material fact regarding Plaintiff's claims, and Defendant is entitled to judgment as a matter of law.

## II. UNDISPUTED FACTS

Defendant currently employs Plaintiff as a Senior Finance Manager and has continuously employed Plaintiff for the past twenty-one years. (**Exhibit A – Beth Arbuckle's Deposition Transcript Excerpts ("Arbuckle"): 42:19, 163:23**).

### A. <u>Plaintiff's Granted Accommodation Request.</u>

Beginning in March 2020 and throughout the COVID-19 pandemic, Defendant allowed its employees to work from home. (ECF No. 1, ¶ 15). During 2020 and 2021, Plaintiff was diagnosed with retinitis pigmentosa and lupus. (**Arbuckle: 81:10-84:10**; ECF No. 1, ¶¶ 17-18).

In 2022, Defendant required employees to return to the office three days per week. (ECF No. 1, ¶ 20). In March 2022, Plaintiff submitted a request to Defendant's Accommodations Management department ("Accommodations Management") to work from home intermittently as-needed based on the weather conditions, as her retinitis pigmentosa made it difficult for her to drive when it was overcast, cloudy, or dark. (**Arbuckle: 12:18-13:11; Exhibit B – Wells Fargo 30(b)(6) Deposition Transcript ("Wells Fargo 30(b)(6)"): 358:13-359:6**). At the time, Accommodations Management in Human Resources was reviewing a backlog of over 10,000 requests from employees seeking to work from home. (**Wells Fargo 30(b)(6): 33:14-23**). While Accommodations Management processed Plaintiff's request, it immediately granted temporary approval to work from home, and Plaintiff's then-manager Paul Foody ("Foody"), also immediately granted her request. (**Exhibit C – Wells Fargo 0002405-0002406, March 2022 Correspondence Between Plaintiff and Paul Foody**; **Wells Fargo 30(b)(6): 31:21-23, 59:1-7; Arbuckle: 70:2-20**). In June 2022, Accommodations Management formally approved Plaintiff's request. (**Wells Fargo 30(b)(6): 358:18-23; Arbuckle: 70:2-18**). Defendant never denied or

delayed Plaintiff's accommodations request, as it was granted on a temporary basis by her managers while pending with Accommodations Management. **(Arbuckle: 68:3-5).**[1]

**B. Return to Office Reporting.**

For an understanding of who was working in the office following the pandemic, Defendant provided in-office reporting ("RTO Reports") to managers. (**Exhibit D – Stephanie Silva Deposition Transcript ("Silva"): 98:4-12; Wells Fargo 30(b)(6): 89:7-10, 101:6-12).** While Plaintiff's request was pending with Accommodations Management, Plaintiff's name appeared on the RTO Reports as not coming into the office from May 22, 2022 through June 26, 2022. **(Wells Fargo 0013652, 0013706, and 0013799, May to June 2022 RTO Reports).** The RTO Reports were not disciplinary or punitive, and Plaintiff was never disciplined or otherwise negatively impacted from having her name on the report. **(Wells Fargo 30(b)(6): 54:12-20, 97:11-17; Arbuckle: 71:8-15, 72:19-75:4)**.

**C. Plaintiff's First FMLA Leave.**

In June 2022, Plaintiff reported to LeRoy Davis, Head of Commercial Banking and Finance. **(Arbuckle: 15:16-24).** Davis then hired Jamey Escaler ("Escaler") as a Finance Director, and Plaintiff began reporting to Escaler instead of Davis. **(Arbuckle: 63:14-16).**

In July 2022, Defendant granted Plaintiff's request for FMLA leave, which Plaintiff took from July 8, 2022 through October 1, 2022. (**Arbuckle: 84:11-16, 90:13-17; Exhibit E – Wells Fargo 00301-00305, FMLA Approval Case Records**).

**D. The Deposit Forecasting Reorganization.**

During Plaintiff's leave, the Commercial Banking team leaders discussed a reorganization which would affect everyone in the Finance Division in deposit forecasting functions (the "Deposit

---

[1] Plaintiff has never requested or sought any other accommodation. (**Arbuckle 136:11-17**).

Forecasting Reorganization"). (**Silva: 73:12-74:24**). Preeti Mone ("Mone") sought to consolidate all employees who worked in deposit forecasting functions under one team headed by her to create a finance team supporting products. (**Silva: 73:12-74:24; Exhibit F – Steven Macko Deposition Transcript ("Macko"): 101:2-15**). Escaler contacted Plaintiff during this time to get her thoughts on the advantages of keeping members of the deposit forecasting team under her. **(Exhibit G – Jamey Escaler Deposition Transcript ("Escaler"): 57:16-22).** Escaler asked Plaintiff to provide her thoughts in "[a] few bullet points or a slide or two." (**Escaler: 58:17).**

Ultimately, Defendant moved forward with the reorganization. (**Silva: 73:12-74:24).** Some of Plaintiff's direct reports and the direct reports of multiple other managers were moved to Mone's team. **(Arbuckle: 88:4-6; Silva: 73:12-74:24; Macko: 101:24-102:4).**

### E. 2022 End-of-Year Performance Evaluation and Compensation

In fall 2022, when Plaintiff returned from FMLA leave, Escaler reported to Steve Macko ("Macko"), after Davis vacated the position. **(Arbuckle: 63:14-65:11).**

In November 2022, there were calibration meetings with managers and Human Resources Business Partners to discuss performance evaluations and compensation. **(Escaler: 88:12-17).** Defendant used a guided ratings distribution, requiring approximately 60% of the employees to receive a "Meets Expectations" performance rating. (**Macko: 100:6-10; Escaler: 19:25-20:7, 80:5-20).**

Plaintiff received a "Meets Expectations" rating for her 2022 year-end rating. (**Exhibit H – Wells Fargo 000105-000107, Plaintiff's 2022 Year-end Review).** A "Meets Expectations" rating is a good rating and is "meant to reflect that an employee is fully delivering, meeting the expectations of their role, and that they are a valuable contributor to the success of" Defendant. **(Escaler: 80:5-20).**

Compensation decisions on Macko's team for year-end 2022 were made through the same calibration process. (**Escaler: 88:12-17**). Other than Macko's four direct reports, Plaintiff was the highest-paid employee in the Finance Department reporting to Macko. **(Macko: 24:3; Wells Fargo 30(b)(6): 366:12-16).** She received a 2% merit increase to her base salary for a new base pay of $230,000 and a discretionary bonus of $195,000, bringing her total compensation for 2022 to $425,000. **(Macko: 44:24-47:9; Wells Fargo 30(b)(6): 146:18-24; Arbuckle: 113:10-21; Exhibit I – 2022 Compensation Summary Statement at Wells Fargo 0003699-0003700.).** Except for Macko's four direct reports, Plaintiff received the highest bonus on Macko's team. **(Wells Fargo 30(b)(6): 360:3-8, 366:4-16).** Additionally, many employees' bonuses were lower than the year before because of the finite nature of the budgets. **(Wells Fargo 30(b)(6): 311:5-6; 365:1-4; Macko: 100:23-101:1).**

On January 20, 2023, Plaintiff met with Escaler to discuss her year-end rating. **(Escaler: 16:2-22).** A week later, Plaintiff met with Escaler to discuss her 2022 compensation. **(Escaler: 17:17-18:2).** Plaintiff expressed her frustration about receiving a "Meets Expectations" rating for her year-end evaluation and her total compensation. **(Arbuckle: 120:9-15).**

### F. Displacement List

For the 2023 fiscal year, Macko asked Escaler and his other direct reports to assess their teams and determine how to achieve certain cost savings. **(Escaler: 91:8-14; Macko: 71:7-10).** As a result, Escaler contacted HR about potentially eliminating the Treasury Senior Manager Position, Plaintiff's position. **(Escaler: 62:3-5).** The tentative notification date for the displacement was June 13, 2023, but Escaler moved to a different position so Defendant postponed the displacement until after a new Finance Director was hired and had evaluated the role. **(Escaler**

**70:4-11).** Ultimately, Defendant did not eliminate Plaintiff's position, and her employment continues to this day. **(Escaler: 62:21-23, 77:17, 79:16-17; Wells Fargo 30(b)(6): 217:14-16).**

### G. Plaintiff's March 2023 Complaint

Plaintiff filed a complaint with Employee Relations and had an attorney send a demand letter on March 27, 2023 (the "Demand Letter"), claiming Escaler retaliated against Plaintiff. **(Arbuckle: 157:21-158:3;** ECF No. 19-10**)**. She claimed only retaliation for her "Meets Expectations" rating and the 2022 compensation change. **(Exhibit J – Wells Fargo 000001-000002 Confirmation Memo, EAP Case # 689400).** Jason Manuel ("Manuel") investigated Plaintiff's complaint by interviewing witnesses and reviewing the performance rating and compensation process. **(Exhibit K – Jason Manuel Deposition ("Manuel"): 15:5-9, 22:18-24, 24:16-19).** Based on the information Manuel gathered, he did not substantiate Plaintiff's retaliation claim. **(Exhibit J; Manuel: 25:17-26:1**).

### H. Plaintiff's June 2023 Loss of System Access

On June 13, 2023, Plaintiff and other employees temporarily lost access to work applications due to a Technology error. **(Escaler: 69:15-22).** This was a system issue involving many employees, not just Plaintiff. **(Escaler: 69:15-22; Wells Fargo 30(b)(6): 220:8-221:19, 222:12-13).** Although the notification date of Plaintiff's displacement was originally slated for June 13, 2023, the displacement had been indefinitely postponed. **(Macko: 17:1-21:25; Wells Fargo 30(b)(6): 204:7-19, 217:14-16).** Plaintiff's access was restored within a week. **(Arbuckle: 137:13-14**). All witnesses testified that her temporary loss of access was a mistake. **(Silva: 148:22-23; Escaler: 69:15-22; Macko: 85:20-24; Wells Fargo 30(b)(6): 220:8-221:19, 222:12-13).**

### I. Plaintiff's Charge of Discrimination

On July 18, 2023, Plaintiff filed a Charge of Discrimination (the "Charge"). (ECF No. 7-2). In the Charge, Plaintiff claims discrimination and retaliation based on her disability. (ECF No. 7-2). Plaintiff alleged: (1) she appeared on the RTO Reports despite requesting an accommodation; (2) she was asked to work on a business case for a reorganization while on FMLA leave; (3) her team was reorganized in a manner that Plaintiff lost a number of direct reports; (4) she was excluded from financial review meetings; (5) she was given a "Meets Expectations" end-of-year performance review; and (6) her 2022 overall compensation decreased 7% year-over-year. (ECF No. 7-2).

### J. 2023 Reorganization

In the summer 2023, then-Finance Director Heather Boucher and Steve Macko evaluated the efficiency of the team and approached Plaintiff about another reorganization. (**Exhibit L-Boucher Deposition Transcript ("Boucher"): 66:7-12**). As a result of this reorganization, Plaintiff assumed oversight for the pricing profitability team and gained five additional direct reports. (**Arbuckle: 143:7-20; Boucher: 66:12-16**).

### K. Plaintiff's Second FMLA Leave

Plaintiff requested and was granted FMLA leave from January to March 2024. (**Exhibit M – FMLA Approval Letter, Wells Fargo 001190–001200**). She does not allege any inappropriate contact during this leave. (**Arbuckle: 148:5-7**). Nor does she allege that she ever requested leave that was denied. (**Arbuckle: 75:9-13**).

## III. ARGUMENT

### A. STANDARD OF REVIEW

Summary judgment is proper when no genuine dispute as to any material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Reyazuddin v. Montgomery Cnty., Md.*, 789 F.3d 407, 413 (4th Cir. 2015). "[T]he moving party must demonstrate the absence of a genuine issue of material fact. Once the moving party has met its burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show that there is a genuine issue for trial." *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874-75 (4th Cir. 1992). "Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Greene v. Scott*, 637 Fed. Appx. 749, 751 (4th Cir. 2016).

**B. <u>PLAINTIFF FAILED TO EXHAUST HER ADMINISTRATIVE REMEDIES FOR HER FAILURE TO PROMOTE CLAIMS.</u>**

"The EEOC Charge defines the scope of the plaintiff's right to institute a civil suit." *Bryant v. Bell Atl. Md.*, 288 F.3d 124, 132 (4th Cir. 2002). "Only those . . . claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996).

Plaintiff filed her Charge on July 18, 2023. (*See* ECF No. 7-2). Plaintiff did not amend her Charge; nor did she file a subsequent charge of discrimination. (*See id*). Plaintiff's Charge does not contain ***any*** allegations about being denied promotional opportunities. (*See id.*)

Before filing the Charge on July 18, 2023, Plaintiff had already applied and not been selected for each of the promotions she complains about in this lawsuit. (**Arbuckle: 50:1-17**; ECF No. 1, ¶¶ 43). Plaintiff testified that she applied for three positions for which she was not selected in 2022 and 2023. (**Arbuckle: 50:1-16**). On October 28, 2022, Plaintiff applied for the Finance

Director – Corporate and Investment Banking position. **(Exhibit N – Wells Fargo 000132-000159, Finance Director Applications).** On November 10, 2022, Plaintiff applied for the Finance Director – WIM Lending position. (**Exhibit O – Plaintiff's Responses to Defendant's First Set of Interrogatories to Plaintiff, at Interrogatory No. 12, p. 13).**

The final role at was applied for in the Spring 2023, when Escaler vacated his position, creating an opening for the Finance Director position. Plaintiff applied for this position, and Heather Boucher was selected. (**Wells Fargo 30(b)(6): 368:2-12**). Plaintiff's non-selection for the Finance Director position occurred in May 2023. (**Arbuckle: 47:11-22, 50:11-21**). Plaintiff acknowledges that there was an announcement about Boucher receiving the Finance Director role on July 9, 2023. **(Macko: 33:7-19).**

Plaintiff did not reference any of these positions in her Charge even though they were all filled before she filed her Charge on July 18, 2023. (ECF No. 7-2). Because failure to promote claims are discrete acts that "start[] a new clock for filing charges alleging that act," Plaintiff failed to exhaust her administrative remedies with respect to her failure to promote claim because these applications occurred before she filed the Charge but were not included in the Charge. *National R.R. Passenger Corp. v, Morgan*, 536 U.S. 101, 113 (2002).

### C. PLAINTIFF'S CLAIMS OF RETALIATION UNDER THE ADA AND FMLA AND DISABILITY DISCRIMINATION FAIL.

Plaintiff's claims fall under the *McDonnel-Douglas* burden-shifting framework. *See Hannah P. v. Coats*, 916 F.3d 327, 342, 347 (4th Cir. 2019). Plaintiff bears the initial burden of demonstrating a *prima facie* claim. *Id.* at 342. If Plaintiff satisfies this burden, Defendant must provide a legitimate, non-discriminatory and non-retaliatory reason for its actions. *Id.* The burden then shifts to Plaintiff to prove the proffered reason was pretext for discrimination or retaliation. *Id.*

#### 1. **Plaintiff Cannot State a *Prima Facie* Case of Retaliation.**

To establish a *prima facie* case of retaliation under the ADA or FMLA, Plaintiff must allege: (1) she engaged in protected activity; (2) she suffered an adverse action; and (3) the adverse action was causally connected to the protected activity. *Id.* at 347; *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 551 (4th Cir. 2006). Even if Plaintiff engaged in protected activity, Plaintiff cannot show she suffered an adverse action.

##### a. **Plaintiff Did Not Suffer An Adverse Action.**

The Supreme Court's decision in *Muldrow v. City of St. Louis*, 601 US. 346, 144 S. Ct. 967 (2024), changed the standard for adverse employment actions in discrimination claims. *See, e.g.*, *Herkert v. Bisignano*, 151 F.4th 157, 166 (4th Cir. 2025). However, the decision did not affect the requirements for retaliation claims. *Id.* In the retaliation context, an adverse action must still be "materially adverse," or "serious enough to 'dissuade a reasonable worker from making or supporting a charge of discrimination.'" *See, e.g.*, *Muldrow*, 144 S. Ct. at 976 (citing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006) and distinguishing the retaliation standard set forth therein).

Plaintiff, a highly compensated current employee of Defendant, received every accommodation that she ever requested, was never denied leave, and has been continuously always employed by Defendant through the present. *Supra* at 1-8. She cannot show that she suffered any "materially adverse" action to support a retaliation claim.

*i. Plaintiff's Name Appearing on the RTO Report Is Not An Adverse Action.*

The appearance of Plaintiff's name for six weeks on RTO Reports in early 2022 cannot be deemed materially adverse. *See, e.g.*, *Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 429 (4th Cir. 2015) (finding that actions were not adverse action because they did not discourage the plaintiff

from taking FMLA leave and "did not lead to further discipline"). The undisputed testimony shows in early 2022 when Defendant was first returning employees to offices, the RTO Reports were simply information on who was coming back to the office and how often. **(Silva: 98:4-12; Wells Fargo 30(b)(6): 89:7-10, 101:6-12).** During the time that Plaintiff's name appeared on the RTO Reports, she had been granted a temporary accommodation to work from home while her request was being reviewed by Accommodations Management. **(Wells Fargo 30(b)(6): 31:11-13, 21-25, 32:9, 18-20, 33:14-23).** The Accommodations Management explained this process applied to all employees in the beginning phase of returning employees to the office, because it was working through a backlog of over 10,000 work from home accommodation requests. (**Wells Fargo 30(b)(6): 31:21-23, 33:14-23).** If an employee who had an open accommodations case raised concerns about appearing on the RTO Report, the Accommodations Manager would inform their manager of the pending case and tell them to disregard the employee's failure to report to the office. (**Wells Fargo 30(b)(6): 50:8-13**). This was unnecessary for Plaintiff because Davis approved her accommodation of working from home and was aware of the reason she was not coming into the office. **(Exhibit C).** Plaintiff never experienced any negative employment impact from her placement on the RTO Report. **(Wells Fargo 30(b)(6): 54:12-20, 97:11-17; Arbuckle: 71:8-15, 72:19-75:4).**

At most, Plaintiff claims that her placement on the RTO Reports caused her embarrassment. (**Arbuckle: 69:1-22**). A concern about embarrassment is not a "materially adverse" action sufficient to give rise to a retaliation claim. *See, e.g., Britt v. Baker*, No. 5:21-CV-00342, 2022 U.S. Dist. LEXIS 132745, at *11 (E.D.N.C. July 26, 2022) ("[Plaintiff] fail[ed] to state any impact from [the alleged action] other than implied embarrassment. Accordingly, plaintiff has failed to allege an adverse employment action."). Here, there are no facts establishing that Plaintiff's appearance on the

RTO Reports for six weeks when her manager had already granted her work from home accommodation would dissuade a reasonable employee from engaging in a protected activity. *See id.*

*ii. Plaintiff's 2022 "Meets Expectations" Rating is Also Not Materially Adverse.*

As a threshold matter, Plaintiff received a satisfactory—not negative—performance rating. The undisputed testimony shows a "Meets Expectations" rating is satisfactory and is "meant to reflect that an employee is fully delivering, meeting the expectations of their role, and that they are a valuable contributor to the success of" Defendant. (**Escaler: 80:5-20**). Through Defendant's guided ratings distribution, approximately 60% of employees receive a "Meets Expectations" rating, indicating that such rating is satisfactory. (**Macko: 100:6-10; Escaler: 19:25-20:7, 80:5-20**).

A satisfactory performance evaluation does not qualify as an adverse employment action absent a tangible job consequence. *Wandji v. Wilkie,* No. 2:18-cv-03036, 2020 U.S. Dist. LEXIS 232035, at *54 (D.S.C. Nov. 9, 2020). Even a negative performance evaluation, by itself, is not enough to be an adverse action. *See Patterson v. Wells Fargo & Co.*, No. 3:23-CV-00407, 2024 U.S. Dist. LEXIS 106245, at *14 (W.D.N.C. May 21, 2024). "The Fourth Circuit has found no adverse employment action when an employee's performance score, though diminished from earlier evaluations, remained within a 'fully acceptable' rating." *Whitaker v. Nash Cty.*, No. 5:11-CV-00015, 2012 U.S. Dist. LEXIS 126375, at *27 (E.D.N.C. Sep. 5, 2012) (citing *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 652 (4th Cir. 2002)).

Plaintiff cannot show her "Meets Expectations" rating resulted in a tangible job consequence. Several employees testified that there is no direct correlation between an employee's year-end rating and their compensation and discretionary bonus. **(Wells Fargo 30(b)(6): 135:25-136:1, 307:24-308:3, 360:9-13; Arbuckle: 114:4-23).** The rating is one of "several components"

that go into the bonus amount. **(Wells Fargo 30(b)(6): 135:20-136:1, 139:22-25).** Plaintiff's year-end compensation and bonus were based on her performance compared to her peers, her total compensation, and the value of her seat—not solely the "Meets Expectations" rating. (**Macko 99:12-21).** Even with her compensation changes, except for Macko's four direct reports, Plaintiff was the highest paid employee in her department, received a salary increase, and received the largest year-end bonus that year. **(Macko: 24:3; Wells Fargo 30(b)(6): 366:12-16).** Thus, the undisputed facts show Plaintiff's "Meets Expectations" rating did not result in any materially adverse action.

*iii. The Reorganizations in 2022 Impacting Plaintiff's Reporting Chains and Number of Direct Reports Are Not Adverse Actions.*

A reorganization "does not constitute an adverse employment action" when an employee holds "the same job title… and had the same salary, . . . experienced only slight changes to [her] duties[,] . . . and there was an additional supervisor between Plaintiff and [her former supervisor]." *Harris v. S. Carolina Revenue & Fiscal Affairs Off.*, No. 3:20-cv-04450, 2022 U.S. Dist. LEXIS 141587, at *27-28 (D.S.C. June 15, 2022); *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th Cir. 2004).

Applying those principles here, the 2022 reorganizations cannot be deemed adverse actions. Plaintiff first complains in June 2022, she was "layered' under Escaler instead of reporting directly to LeRoy Davis. (**Arbuckle: 63:20-21**). Plaintiff next complains of the Deposit Forecasting Reorganization in November 2022 when her direct reports in deposit forecasting, as well as others in deposit forecasting who were not on her team, were moved to another manger as part of a broader restructure. (**Arbuckle: 88:8-24**).

Plaintiff acknowledges that Defendant goes through constant reorganizations. **(Arbuckle: 61:19-25, 147:11-15).** Boucher described this as a typical process, noted that she also went through

similar reorganizations, and that she was treated the same as Plaintiff (in terms of changing levels through reorganizations without any compensation or title change). (**Boucher: 12:6-8, 72:5-73:22**). Plaintiff's job title and salary were never reduced during these reorganizations. (*See* **Boucher: 72:16-22** (noting that Plaintiff's compensation did not change during the reorganizations)). As these were only changes to her reporting structure and direct reports, the reorganizations in 2022 do not amount to a materially adverse action for purposes of a retaliation claim.

*iv. Considering Plaintiff for Displacement is Not an Adverse Action.*

Courts have explicitly held that a ***proposed*** termination that never occurs is not an adverse action. *See Rock v. McHugh*, 819 F. Supp. 2d 456, 470–71 (D. Md. 2011) (recognizing a proposed termination does not constitute an adverse action in a retaliation claim). Even a threat of termination—where the employee is contemporaneously aware of the potential adverse action—has been held not to constitute an adverse action. *See Patterson v. Va. Dep't of Corr.*, No. 3:23-cv-00757, 2024 U.S. Dist. LEXIS 72197, at *14-15 (E.D. Va. Apr. 19, 2024).

For example, in *Noonan v. Consol. Shoe Co., Inc.*, 84 F.4th 566 (4th Cir. 2023), the Fourth Circuit held that a supervisor's misrepresentation that knowing a co-worker's pay was a fireable offense—thereby threatening discharge—was not an adverse action. *Id.* at 575. Similarly, the District of Maryland found that a reprimand letter warning of termination for future violations did not amount to an adverse action. *Nam v. 2012 Inc.*, No. DKC 15-1931, 2016 U.S. Dist. LEXIS 2778, at *16 (D. Md. Jan. 11, 2016); *see also Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1029 (7th Cir. 2004); *Hollins v. Atl. Co. Inc.*, 188 F.3d 652, 662 (6th Cir. 1999) (threat of possible discharge standing alone was not an adverse employment action).

Here, Plaintiff was not aware her position had been proposed for displacement; she alleges only that, without her knowledge, her position was proposed for a displacement which never occurred. Thus, Plaintiff cannot sustain a claim of retaliation because she never suffered an adverse action. *See also Patterson v. Wells Fargo & Co.*, U.S. Dist. LEXIS 106245, at *17-20 (granting defendant's motion to dismiss plaintiff's discrimination and retaliation claims where the plaintiff alleged her supervisor advised management to terminate her, but she was not actually terminated).

**b. <u>Plaintiff Cannot Show A *Prima Facie* Claim Of Disability Discrimination.</u>**

Plaintiff's *prima facie* disability discrimination claim fails for the same reason as her retaliation claim; because Plaintiff cannot establish that she suffered an adverse employment action even under the lesser *Muldrow* standard.

Following *Muldrow*, Plaintiff must show "some harm" to establish an adverse employment action in a discrimination claim. 601 U.S. at 355. Although "[a]n adverse employment action does not require a significant . . . [o]r serious, or substantial" or other heightened standard, it does require "some harm respecting an identifiable term or condition of employment." *Id. Muldrow* does not give an employee carte blanche to allege that every grievance is an adverse employment action or discrimination. An adverse employment action must affect the terms and conditions of an employee's employment, and even then, not all job changes are sufficient. *See DeLaughter v. Verizon Commc'ns, Inc.*, No. 6:22-cv-02370, 2024 U.S. Dist. LEXIS 217977, at *30 (M.D. Fla. Dec. 3, 2024) ("Even under *Muldrow* 'not everything that makes an employee unhappy is an actionable adverse action.'"); *Glanville v. Mayor of Baltimore*, No. EA-23-3395, 2024 U.S. Dist. LEXIS 234484, at *20 (D. Md. Dec. 31. 2024)("Not all changes to an employee's identifiable terms or conditions of employment constitute an adverse employment action. The change must be disadvantageous.").

As with cases in the retaliation context, courts applying *Muldrow* to discrimination claims have continued to hold that a satisfactory performance evaluation is not an adverse employment action. For example, in *Porter v. VA*, decided after *Muldrow*, the court held that Plaintiff's lower performance rating was not an adverse action absent evidence was disadvantaged by the rating. No. 4:23-cv-00002, 2024 U.S. Dist. LEXIS 122864, at *14-15 (E.D. Ark. July 12, 2024); *see also LeCarde v. AG Pa.*, No. 23-2898, 2024 U.S. App. LEXIS 12980, at *9-10 (3d Cir. May 30, 2024) (finding that plaintiff's receipt of a satisfactory performance rating was not an adverse action as no evidence suggested it "carried with it any threat of discipline or other action that would dissuade a reasonable employee from reporting discrimination.").

Furthermore, any changes to Plaintiff's 2022 discretionary bonus were not an adverse action. Courts have found that a change to a discretionary bonus is not an adverse action. *See Calloway-Durham v. N.C DOJ*, 5:21-cv-00371, 2022 U.S. Dist. LEXIS 155257, at *14-15 (E.D.N.C.2022); *Credle v. Va. Cmty. Coll. Sys.*, 2025 U.S. Dist. LEXIS 1203, at *22 (E.D. Va. Jan. 3, 2025) (collecting cases within the Fourth Circuit). In *Calloway-Durham*, the Court found that Plaintiffs "meets expectations" performance review that disqualified her for a merit-based bonus was not an adverse action. *Id.* In making this decision, the Court reasoned that a merit-based bonus "means that it was not an automatic raise and needed to be earned;" therefore, failure to achieve this bonus is not an adverse action. *Id.* It is undisputed that the 2022 year-end bonus was discretionary and based on numerous factors. **(Arbuckle: 113:22-114:9; Silva: 131:9-18; Wells Fargo 30(b)(6): 135:20-136:1, 139:22-25; Macko: 99:12-21).** It therefore did not have a tangible effect on the terms and conditions of employment and cannot be an adverse action. *See Nasis-Parsons v. Wynne*, 4:05-cv-00036, 2006 U.S. Dist. LEXIS 35325, at *17 (4th Cir. 2007) (holding that "the loss of a

discretionary or gratuitous bonus does not have a tangible effect on the terms or conditions of employment when the employee is not entitled to her bonus").

Nor are any of the other employment actions that were exhausted in the Charge sufficient to establish harm under the *Muldrow* standard for the same reasons discussed above. *Supra* 10-15.

**c. <u>Defendant Had Legitimate, Non-Discriminatory And Non-Retaliatory Reasons For Its Actions.</u>**

*i. Reorganizations and Consideration of Plaintiff's Position for Displacement.*

The Fourth Circuit has long recognized broader reorganizations driven by operational needs as legitimate, non-retaliatory and non-discriminatory reasons. *See, e.g.*, *Yashenko*, 446 F.3d 541 (affirming summary judgment in FMLA retaliation case where the departmental reorganization was the legitimate reason for the action); *Propst v. HWS Co.*, 148 F. Supp. 3d 506, 2015 U.S. Dist. LEXIS 163717, at *47-48 (W.D.N.C. Dec. 7, 2015).

Davis made the decision to have Plaintiff report to Escaler instead of Davis to bring the Balance Sheet and Revenue COE teams together within Financial Planning and Analysis ("FP&A"). (**Exhibit P – Defendant's Responses to Plaintiff's First Set of Interrogatories to Defendant, at Interrogatory No. 6, p. 3**; **Wells Fargo 30(b)(6): 117:21-25**). Plaintiff retained the same direct reports, job title, job duties, and compensation. (**Wells Fargo 30(b)(6): 118:17-19**). The Deposits Forecasting Restructuring served a legitimate business purpose—it moved certain functions to support a different line of the business. (**Silva: 73:12-74:24; Macko: 101:2-15**). For each of the reorganizations, others who were not on leave and outside of Arbuckle's team were treated similarly. **(Arbuckle: 88:4-6; Silva: 73:12-74:24; Macko: 101:24-102:4**). Neither Plaintiff's leave nor her accommodations request played a factor in these decision. **(Macko: 102:5-8).**

As to the potential displacement, the Finance Team was asked to achieve cost savings in 2023 which factored into the equation of identifying roles for potential displacement. (**Escaler: 91:7-14**). Escaler initially slated this role because it had been narrowed in scope as the result of the deposit team moving to another organization, making the role of treasury senior manager redundant. (**Escaler: 91:1-6**).

All of these undisputed explanations are legitimate, non-retaliatory and non-discriminatory business reasons.

ii. *2022 Rating and Compensation.*

Plaintiff's 2022 year-end rating and total compensation were also based on legitimate, non-retaliatory and non-discriminatory business reasons. For all teams, the guided performance ratings distribution was 5% Consistently Exceeds, 15% Exceeds Expectations, 60% Meets Expectations, 15% Inconsistently Meets Expectations, and 5% Needs Improvement. (**Macko: 100:3-11**). Applying the ratings curve and the performance rating scale, Plaintiff was assigned a "Meets Expectations" rating when her contributions were considered alongside the contributions of all others in the Finance Division reporting to Steve Macko. **(Exhibit P, at Interrogatory No. 7, p. 4; Macko: 27:12-21).** Macko and Escaler agreed during the calibration meetings that the appropriate rating was a "Meets Expectations." (**Escaler: 53:12-25; Wells Fargo 30(b)(6): 302:21-303:14, 128:10-23**). There were others on Macko's team in the Finance Division that also went from an "Exceeds Expectations" rating at the mid-year review to a "Meets Expectations' rating at the year-end review. (**Macko: 98:17-22**). Plaintiff was one of three employees who worked under Macko, received an "Exceeds" rating during mid-year evaluations, and a "Meets" during the year-end. **(Macko: 100:21-22; ECF No. 19-10, p. 10; Wells Fargo 30(b)(6): 362-**

**364:14).** Plaintiff acknowledged she was told that she was assessed against the broader Finance Division as part of the calibration process. (**Arbuckle: 102:4-8**).

For the bonus pool, there was a limited amount of money to allocate across Macko's team. **(Macko: 51:1-6; Wells Fargo (b)(6): 364:15-365:11).** Merit pay or bonus amounts given in one year do not guarantee the same or higher bonus or pay in a subsequent year. **(Wells Fargo 30(b)(6): 143:7-15, 145:9-15, 18-21, 146:18-147:1, 148:17-22; Macko: 46:7-14).** Escaler's initial compensation recommendations were decreased during the calibration process because he was significantly overbudget on the bonuses relative to the available pool. **(Wells Fargo 30(b)(6): 365:5-11).** Plaintiff's compensation was tied to the value of the seat for the work being performed, as well as her overall performance relative to peers. (**Macko: 99:12-21**).

Courts have held that an employer's use of a ratings distribution curve, forced ranking system, or comparative evaluation methodology constitutes a legitimate, non-retaliatory and non-discriminatory reason for a particular employment action if the system is applied consistently. *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 234 (4th Cir. 1991); *Anderson v. NVR*, 2010 U.S. Dist. LEXIS 137460, at *16-17 (D. Md. 2010); *see also Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248 (4th Cir. 2005) (discussing comparative evaluation for reduction in force and holding that the process established a legitimate, non-retaliatory basis for the decision).

Here, the undisputed evidence shows Plaintiff's year-end rating and compensation were the result of the comparative evaluation process which was applied consistently across the team. Thus, she cannot bring a claim of retaliation or discrimination based on her 2022 performance rating or total compensation.

*iii. Finance Director Selection.*[2]

The Fourth Circuit has also held that the superior qualifications of a candidate selected for a promotion is a legitimate, non-retaliatory and non-discriminatory reason for the promotion decision. *Hux v. City of Newport News*, 451 F.3d 311, 314–15 (4th Cir. 2006).

Macko explained Boucher was more qualified than Plaintiff for the Finance Director role because she was running the largest team within FP&A, was already handling FP&A's core SEC reporting, and was producing on all the business units with senior leaders of the commercial bank. (**Wells Fargo 30(b)(6): 367:7-368:12**). In comparison, Plaintiff was only responsible for a segment of the FP&A team. (**Wells Fargo 30(b)(6): 367:10-22**). Plaintiff agrees that Boucher was qualified for the role. (**Arbuckle: 127:15-21**). Even after the promotion, Plaintiff made more money than Boucher. (**Boucher: 71:11-24**). Plaintiff also admits she has no proof that her remote work status had any impact on her applications for these positions. (**Arbuckle: 134:8-13**).

**D. PLAINTIFF'S FMLA INTERFERENCE CLAIMS ALSO FAIL.**

To establish a *prima facie* FMLA interference claim, Plaintiff must demonstrate that (1) she was entitled to an FMLA benefit; (2) her employer interfered with that benefit; and (3) that interference caused harm. *Adams*, 789 F.3d at 427.

**1. Escaler Had *De Minimis* Work-Related Contact With Plaintiff While She Was On Leave.**

Courts have recognized that *de minimis* contact with an individual on FMLA leave does not violate the FMLA. *See, e.g., Chauncey v. Life Cycle Eng'g, Inc.*, No. 2:12-CV-968-DCN, 2013 U.S. Dist. LEXIS 140579, at *13 (D.S.C. Sept. 30, 2013) ("[F]ielding occasional calls about one's job while on leave is a professional courtesy that does not abrogate or interfere with the exercise

[2] As noted above, *supra* at 8-10, the failure to promote claim was not exhausted and should be dismissed on this basis alone.

of an employee's FMLA rights."). "It is equally clear that actionable FMLA interference does not include *de minimis* work-related contact, such as a telephone call to request client contact information or a call to update an employee about news in the workplace." *Antekeir v. Lab. Corp. of Am.*, 295 F.Supp.3d 679, 684 (E.D. Va. Feb. 8, 2018) (granting summary judgment where co-workers and supervisors made several phone calls while on leave). Likewise, in *Neloms v. Charleston Cty. Sch. Dist.*, the court granted summary judgment on an FMLA interference claim where the school district contacted the plaintiff to have her send an accounting of outstanding projects to manage in her absence. 2019 U.S. Dist. LEXIS 157732, at *32-35.

Escaler contacted Plaintiff only briefly to get her thoughts and perspective on the Deposits Forecasting Reorganization because it would affect her team. **(Escaler: 57:16-22).** Escaler asked for "[a] few bullet points or a slide or two." **(Escaler: 58:17).** This constitutes *de minimis* contact similar to that in the cases cited above.

In any event, Plaintiff cannot show she was prejudiced by any violation. *Moticka v. Weck Closure Sys.*, 183 F. App'x 343, 347 (4th Cir. 2006) ("Before liability will be imposed on an employer for violating an employee's rights under the FMLA, the employee must show that she was prejudiced by the violation."). Plaintiff failed to proffer any damages resulting from the *de minimis* contact. Accordingly, Plaintiff's FMLA interference claim fails.

**2. <u>2022 Reorganizations</u>.**

It is well-established that an employee on FMLA leave may experience job changes if those changes would have occurred regardless of the employee's FMLA leave. *See, e.g.*, 29 C.F.R. § 825.216(a); *Laing v. Fed. Express Corp.*, 703 F.3d 713 (4th Cir. 2013); *Yashenko*, 446 F.3d at 547; *Mercer v. The Arc of Prince George's Cnty., Inc.*, 532 F. App'x 392 (4th Cir. 2013);

The Deposits Forecasting Reorganization occurred to create a function in finance that oversees products. (**Macko: 101:2-9; Silva: 74:4-10**). All employees in deposit forecasting, including the direct reports of Plaintiff and other managers who were not on FMLA leave at the time, were transferred under the new global treasury management reporting structure. **(Macko: 101:9-13; Silva: 74:4-24; Escaler: 91:1-6).** The undisputed evidence shows Plaintiff's role was not singled out—anyone in a deposit forecasting role, regardless of who they reported to, was moved to another leader to support the new structure. **(Macko: 101:24-102:4)**. Neither Plaintiff's leave nor her accommodation played any factor in the reorganization. **(Macko: 102:5-8).** Such reorganizations are commonplace, a fact that Plaintiff acknowledges. **(Arbuckle: 90:13-17, 90:21-93:24).**

## IV. CONCLUSION

For the foregoing reasons, Defendant respectfully requests this Court grant its Motion for Summary Judgment and dismiss Plaintiff's claims with prejudice.

**ARTIFICIAL INTELLIGENCE CERTIFICATION**

No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or paralegal working at her direction as to the accuracy of the proposition for which it is offered, and the citation to the authority provided.

**CERTIFICATION OF COMPLIANCE WITH THE COURT'S STANDING ORDER**

Undersigned counsel hereby certifies pursuant to the Standing Order Granting Civil Case Management Before the Honorable Frank D. Whitney, this Memorandum does not exceed 6,000 words.

Respectfully submitted this the 8th day of January, 2026.

**JACKSON LEWIS P.C.**

BY:

FLORENCE THOMPSON
N.C. Bar No. 55195
200 S. College St., Suite 1550
Charlotte, North Carolina 28202
Telephone: (980) 465-7254
Florence.Thompson@jacksonlewis.com

STEPHANIE SATTERFIELD
S.C. Bar No. 68791
15 South Main Street, Suite 700
Greenville, SC 29601
Telephone: (864) 672-8048
Stephanie.Satterfield@jacksonlewis.com

***Attorneys for Defendant***

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Civil Action No. 3:24-cv-01068-FDW-SCR**

| | |
|---|---|
| BETH ARBUCKLE,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>Defendant. | **CERTIFICATE OF SERVICE** |

The undersigned certifies that on January 8, 2026, the foregoing ***Defendant's Memorandum in Support of its Motion for Summary Judgment*** was electronically filed with the Clerk of the Court, using the Court's CM/ECF electronic service system, which will send service to the following:

L. Michelle Gessner
Gessner Law, PLLC
602 East Morehead Street
Charlotte, NC 28202
michelle@mgessnerlaw.com

**JACKSON LEWIS P.C.**

BY: */s/ Florence Thompson*
FLORENCE THOMPSON
N.C. Bar No. 55195
200 S. College St., Suite 1550
Charlotte, North Carolina 28202
Telephone: (980) 465-7237
Florence.Thompson@jacksonlewis.com

STEPHANIE SATTERFIELD
S.C. Bar No. 68791
15 South Main Street, Suite 700
Greenville, SC 29601
Telephone: (864) 672-8048
Stephanie.Satterfield@jacksonlewis.com
*Admitted Pro Hac Vice*

***Attorneys for Defendant***