# Exhibit A

## Beth Arbuckle's Deposition Transcript Excerpts

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No. 3:24-cv-01068-FDW-SCR

BETH ARBUCKLE, )
Plaintiff, )
V. )
WELLS FARGO BANK, N.A., )
Defendant. )

Remote Deposition of
Beth Arbuckle
(Taken By Defendant)
Tuesday, October 14, 2025
10:00 a.m.

JOB NO.: SC 7650267
REPORTED BY: Leslie Christian Lentkowski

A. Please.
Q. This question asked -- let me make sure I hit "share." Sorry.
A. I don't see it. There we go.
Q. And just let me know how much time you need to review it.
A. Um-hm. So which piece are we looking at here?
Q. So I'm going to ask you -- this question asked who could have discoverable information related to this matter? and you provided a list of individuals. So I was just going to ask you what information you believe each person has.
A. Okay.
Q. Does that make sense?
A. So do you want to just start going through each name?
Q. Yeah. We can just start with Paul. I believe he was your manager at the time of your original accommodation request in March of '22; is that correct?
A. Yes. That's correct.
Q. Is there anything else that you believe he has information about?
A. So Paul was my manager just as this was

transitioning. He's aware of what my performance was in the first half of the year and that it was an "exceeds" and would testify to that. He knows that I requested the accommodation formally. He was actually one -- I believe, one of the -- when I talked to him about it, said that I needed to do it formally because of the requirement of folks coming back into the office. I think that's primarily what it is. He could talk to my performance and that I had applied for the accommodation in 2022.

Q. Okay.

A. That's it.

Q. And if you ever think of anything else you want to add on later, feel free.

A. Yeah.

Q. And Marc Winneford -- what information do you believe he has?

A. Marc Winneford was actually managing Paul Foody at that time. He was also aware of my performance and would have, through calibrations or challenges, been aware that it was an "exceeds."

He, also, as we were getting ready to head into the transition at the end of 2021, I believe it would have been, knowing that some of this movement was happening, contacted me to reassure me that I was a

was a backlog and it would take time, but "Go ahead and work from home in the meantime. You're perfectly fine. You're not on any bad list."

I specifically asked my HR representative about that multiple times. Week after week, I'm showing in the meeting, and I was still on the list. I was sending notes to HR like, "Hey, this is embarrassing." Because not only was I on the list, we had to go around the room and explain why we or our team members were not meeting the in-office expectations.

And he also -- prior to departing Wells Fargo, he inherited me from Paul; and him and Paul, together, agreed that my performance to date was an "exceeds" as of July.

Q. And we'll go through the changes in your reporting structure again in a minute just so that I'm clear; but if I understand correctly, you reported to Paul Foody in March of '22, and you briefly transferred over to report to LeRoy Davis later in the spring or early summer of 2022. And they're the ones who participated in your midyear 2022 performance evaluation?

A. Correct. And I'm glad you mentioned that. Thank you. So the other thing that LeRoy would attest

A. Arbuckle.
Q. Okay. Thank you. And who is Jing Zhou?
A. She is a colleague who worked with me prior to us moving from Paul Foody into the line of business.
Q. Okay. So she's also a work colleague who you've shared some information about the lawsuit with?
A. Correct. Correct.
Q. And have you asked anybody for a statement or to be a witness for you?
A. No, I have not.
Q. Okay. I want to take a step back. And just a reminder -- we can take a break anytime you need one; so just let me know if there's any place you want to stop.
I want to just take a step back and talk about your current role and your job duties; so if you can just share with us what your current title is and what your job duties are, just more broadly.
A. My current title is Senior Finance Manager. I manage the lending/forecasting team as well as a team member that supports credit product factor. I don't think I've ever had to describe what it is. I call them the "profitability support." They do credit product expense factors that get loaded into a profitability tool for CIB and commercial banking.

meeting, and Steve and his peers pushed back."

"Does she even want it?" And so that's the perception they have now because these peers are reported as their peer for a month or two and then layered, and then they just see "Remote. Remote. She's got an accommodation. She must not be committed," when you have Steve saying in meetings with them, "Yeah. The requirement is three days in the office. I don't hire underachievers. I want overachievers."

So there is this culture that's been driven, and it says you're not going to do it. Even though Heather was my direct manager, she worked in and around me for 20 years. She's told me, "Hey, I had you as my high potential. I had you as my ready replacement." And I know when these things happen because I've been part of it for 21 years. I've been the manager, and I've been on the receiving side of it. But, hey, when you have succession planning, have a conversation -- "Hey, this role is open, Beth. Are you interested in it? I see you haven't applied for it. You would be really qualified."

You go and you target the people that you know. You talk to them. And so once I'm not even given the professional courtesy of saying, "Hey, Beth,

Q. That's the one that you applied for where Jamey Escaler had been in the position and you applied for the role?

A. Yes.

Q. The one that's listed here in Interrogatory Response 12 as "Finance director-commercial banking, May 2023, Steve Macko"?

A. Right. I think what this lists is all the managers, and it's commingling work changes as well as the roles that I applied for.

Q. Thank you for that clarification. Just while we're on the subject so we don't have to come back to it later, do you know if that's true for everything in 2022 as well? That these are title changes as opposed to positions you applied for?

A. No. The other two that I applied for -- yes, except for two. So there is the October 2022. I applied for a role in CIB under April Frazer and then also a role in wealth management that would have been under Jennifer Madara. I did not get callbacks or even screenings from HR. It's just surprising to not get a screening. At that time -- at this point, there is a concerted effort for location optimization. And I asked the question because, at that point, I was still listed as remote. So if you go into our Teamwork site

makes you think that they have a disdain for a medical accommodation of working from home?
A. I don't know of anything from Pugh. I've had limited interaction. Nothing that I would know. He's in New York. And Preeti -- just in asking about where Philipe was -- about him being remote -- I don't know at this point.
Q. And you mentioned earlier you've been employed with Wells Fargo for over 21 years. Congratulations. Is that the correct number? Over 21?
A. I think it was 21 in February. I think that's right. 2004.
Q. And without any break in service. You've been continuously employed the whole time?
A. Correct.
Q. And you've never been suspended or any disciplinary action or anything like that, correct?
A. No, I have not.
Q. Okay. Now we're going to walk through -- and I know this is going to be complicated. Is it fair to say that there's a lot of restructure activity at Wells Fargo in the finance division?
A. Since the time I started with the bank -- reorgs, mergers -- the pendulum swings back and forth, back and forth. That's correct.

"I'm just going to start including you on my team meetings. We're just going to start integrating you now."

So at some point prior to that, I was already operating as if I was on his team; so I would say March or a little bit earlier. The conversations started in January with each of the CFOs about the team transitioning to them.

Q. And the --

A. I'm sorry. And I will add -- and where people were going to report and who to was a very detailed process of the move the lines, and it was in a conversation with LeRoy and with HR participating.

Q. And then later in June 2022 is when Jamey Escaler became your direct manager?

A. Yes. In July.

Q. In July? Okay.

A. In July.

Q. He reported still to Marc?

A. No. He was a report of LeRoy. So Jamey reported to LeRoy, and I was layered under him.

Q. Okay. So the reporting structure, at that point in time, was LeRoy, Jamey, and then you were a direct report of Jamey?

A. Correct.

Q. And Leroy still reported to Marc?
A. No. LeRoy would have reported to, I believe, Santomasimo. So LeRoy and Marc would have been peers, maybe. It's two different organizations. One is corporate and one is line of business.
Q. I see.
A. Yeah.
Q. That helps. Thank you.
A. You're welcome.
MS. GESSNER: Before you ask another question, we've been going about an hour and a half. Let's take a bathroom break.
MS. SATTERFIELD: Sure. I'm happy to.
(A break was taken.)
BY MS. SATTERFIELD:
Q. Okay. We were at July 2022. You started reporting to Jamey Escaler; and then as I understand it, in 2023, Jamey left -- vacated the position -- and that was the position you applied for. That was around May 2023?
A. I believe it was, yes.
Q. And Heather Boucher was selected for Jamey's role; so she became your direct manager at that time; is that right?
A. That's correct.

Q. Okay. And then from Heather, it became your current manager. After Heather, it became Preeti?
A. Correct.
Q. Anybody we missed in your direct manager reporting from 2022 to present?
A. No. I think you got it.
Q. And then when did Steve Macko become Jamey's direct manager?
A. I think it happened while I was on leave; so maybe in the October time frame of 2022. September or October.
Q. And Steve remained in that role -- Jamey reporting to Steve and then Heather reporting to Steve -- until what you just described occurred recently where Pugh became the manager over Preeti; is that correct?
A. Well, Jamey was reporting to Steve until he had moved into another -- was moved into another role. Surprisingly, rather abruptly, he hadn't been in that role very long. I don't even know if it was a full year. And then that's when that position was vacated, and I applied for it -- and Heather as well -- and Heather became the head of FPA. That was the one that applied and got an HR screening and not even a conversation with Steve.

A. HR accommodations team or something to that effect.
Q. Since 2022 have you ever requested a accommodation that was denied at Wells Fargo?
A. No.
Q. And are you still currently working from home? Again, I understand you have some flexibility where you might go into the office as needed, but are you predominantly working from home still?
A. Predominantly home and go in as needed as much as I can and for critical interactions and meetings.
Q. And that work from home as an accommodation, that was never denied. That's always been granted since you first requested it, correct?
A. It was except for the challenge from HR to have to resubmit to a different HR group. So Steph Silva's group saying, "No, you need to do this again. There's not enough time to go through the process. Give it to us."
Q. And that was the December 2023 back-and-forth we talked about earlier?
A. Correct. And then I pushed back and pushed back. I ultimately gave them the information they asked for but told them it was wrong.

Q. And in that time period between when they said that you needed to resubmit your certification in early December to December 20th when it was resolved, were you required to go into the office during that time period, or were you still allowed to work from home?

A. I was told to continue to work remotely until it was formally approved.

Q. Okay.

A. That window was when I kept showing up on the bad list -- we call them the "bad list," right? That was that window. And I kept going back to accommodations and saying, "Hey, can you do something about this?"

Their response was, "No. You shouldn't be showing up on any list."

I said, "Well, I am. And here it is. Please do something about it."

It was embarrassing. These are my new peers, and this is their first view of me is that "She's going to do what she wants." I was definitely the only manager showing up.

Q. When you say "bad list," I think you're referring to the noncompliance report, but please correct me if I'm wrong.

A. Yes, you're correct.
Q. And just so we're clear on time frames, I believe that you were showing up on the noncompliance report for some period of time between when you had -- we saw you send that e-mail back and forth with Paul Foody in March 2022 where he says, "Yes. You can work from home while HR is working through their backlog -- while HR is working through their backlog until June 2022," and then they officially grant your accommodation. Is that the time period you're referring to as when you were showing on the noncompliance report?
A. Yes. That's when I was showing on the noncompliance report -- from the time that Paul Foody said I could work remote, from the time HR accommodations said I could continue to work remote until the formal "Hey, your request has been approved in June."
Q. 2022?
A. Correct.
Q. Because -- I just want to be clear that -- and tell me if I'm wrong -- I don't believe you were showing up on the noncompliance report in early December of 2023 when there is that back-and-forth about whether you needed to resubmit something. You

tell me if I'm wrong. Were you on the noncompliance report in December 2023 as well?

A. I do not know because I was removed from those senior leadership meetings; so I have no idea. When I got layered under Jamey, I was no longer attending those senior leadership meetings and getting -- not being privy to that information.

Q. And this noncompliance report, did you ever receive any discipline for being on it?

A. I did not receive discipline. I just received the humiliation and embarrassment of being called out every week in front of my peers in that format when everybody knew the push was to get people back into the office. And if you weren't, you were going to be disciplined.

So, no, I wasn't disciplined; but the perception of my peers -- they didn't know that. They didn't know that I had an accommodation. And so that's why I kept trying to get off the list. I'm like, "Okay. Get me off of this. Get me off of this." At that point it's all still very new. I had been with the bank at that point 19, 20 years; and I didn't want to be labeled as anything other than doing what's expected of us, right? And so it hit hard that "Hey, you're not making any delineation between somebody who

has a real request for an accommodation for a disability that I didn't" -- I was still in shock over it. "Are you kidding me?" In the prime of my career, how was this happening?

You know, I would have expected somebody like HR accommodations to address that list. I immediately sent it, and nothing happened for weeks. So, yeah, it wasn't the discipline. It was more just the embarrassment, and then that frames their perception. "Hey, does she really want this job?"

Q. When you --

A. "Is she committed?"

Q. Go ahead. Sorry. I don't mean to cut you off. Please finish.

A. No. No. That was it. The things that -- if I saw somebody that's not coming in and not meeting expectations, I would be like, "Do they really want it if they're not meeting expectations?"

Q. The group that got the noncompliance report, when you say "peers," are you meaning the peer group that you had been in when you were peers with Jamey? Or was there a group reporting to Jamey that you're referring to that were your peers at the time who got the report?

A. No. It was when I was a peer of Jamey, and

Jamey -- so direct of LeRoy. I was direct of LeRoy.
Q. Do you know -- go ahead. Sorry to keep going.
A. That's okay.
Q. I was just trying to make sure I understand who -- because I don't know all the names. I can see the e-mail chain, but I don't know all of their positions. Do you know how far down in the organization managers got the noncompliance report? In other words, did it stop with -- and I'm only talking about the time period between March 2022 and when your accommodation was granted in June 2022. During that time -- the distribution of the noncompliance report -- did it go to people at Jamey's level or one level down from Jamey's level or something else?
A. It went to LeRoy's directs, which was mine and Jamey's level. And in some groups, if you had another senior person -- say, for example, I had a senior person on my team that was considered part of the leadership team, they may be on that call. I did not have a direct on that call. Other peers of mine may have had their directs on that call; so then it's people even below me are witnessing -- right? -- who's on the list and who's being called out. And it was every week. "Pull out the list. Let's go through it.

Tell me why so-and-so on your team" -- you had to go through the list and say who was on the noncompliance report and what you were doing to get them in the office.
Q. And so I assume -- well, I shouldn't assume. Was Philipe on the noncompliance report, too?
A. At that time, no, because he did not -- I don't remember the time frame of when he made an HR accommodation. At that time, I don't believe he would have been because he did not have a request.
Q. So the conversation, though, on these calls generally each week was, "Tell me why they're on the report or what you're doing to get them into the office." Is that generally the content of what was talked about about the noncompliance report?
A. Yes. And the conversations -- I specifically recall one of my team members having to say, "Oh, this person was out for" -- blah, blah, blah. "They had surgery." And then went into detail on why they had this surgery and why they're going to need to continue to be out. So it wasn't just that they've got an approved exception. It was -- they're defending it. And even that part -- because I'm waiting for it to come my way -- I texted that manager. I'm like, "Hey, you shouldn't be talking -- like, this isn't right.

Why are we having to defend or disclose people's medical situation in a form like this?" And HR, Steph Silva, was on these calls and didn't say a word. She didn't say a word.

Q. And I know, Ms. Arbuckle, you've had to take a few medical leaves of absence, and we'll go through the dates of those and the things that occurred during each leave. But my question at this point is: Have you asked for any medical leave of absence that's been denied while employed at Wells Fargo?

MS. GESSNER: Object to form.

THE WITNESS: To that one, I would say I have not. However, when I was on leave under Jamey Escaler, I was contacted constantly about "When are you coming back?"

"I'm working with Lincoln Financial. They're working with my doctors."

They went through an exhaustive process back and forth to get and finally approve it as a medical, and I kept being contacted. Now, at this point I'm scared of losing my job, right? I'm at 19 and a half years at that point. I'm afraid of losing my job. I'm scared. Nobody is saying," Hey, take all the time you need. Your health is important." All the things that I have done over my career and what we say

through an organizational change or a plan like that, you work with HR and your HR partner, who would have been Steph Silva.

Q. Was Steph on any of the calls you were on with Jing or Preeti or Jamey?

A. Not that I recall.

Q. And do you recall her being on any of the text messages with Jamey?

A. No.

Q. You mentioned that you were kind of, I mean, just stunned and shocked; and it was a really difficult time in 2022 with your medical conditions worsening. Could you just briefly tell us about what conditions you have that are disabling that require you to predominantly work from home?

A. So the two -- it would be -- and I would say it was more of an awareness of what was going on, right? I had been on a journey to find out. It was more of "This is what it is." Retinitis pigmentosa -- it is a degenerative eye disease. There is no cure for it. There is no specific timeline on how fast it progresses. Many people go completely blind or end up with tunnel vision. Some live a long time with just losing their peripheral vision, which is essentially what's happened to me.

I don't have any peripheral vision. And the way that happens is your cone and rods in your eyes die. And as that's happening, your eyes -- you get blind spots within your eye. Think about if you're looking straight forward and there's a doughnut, and then these little patches just start showing up. You can see around the doughnut and the center of the doughnut. These patches come up, and your eyes try to fill it in, right? Your eyes play tricks on you. That's why it's like, "Gosh, my eyes are always so tired. I'm having these issues." But I didn't know that's what it was. It's very hard to see in certain light settings. It's very hard to transition light. I don't drive at night; I don't drive in the rain. If it's dim, sunrise, sunset, it's very hard to see. I don't drive anymore under those conditions. It will never get better.

The secondary thing was lupus which, typically, like, during that time period, I was getting treated for a lung condition; and so my lupus couldn't be treated. So I was probably taking more frequent breaks, right? You take a rest in the morning and evening, but with lupus just comes the normal -- lots of achy hands, headaches, migraines. There's a lot of things that go along with that. The key one that was

not part of the accommodation but then led into the need for leave was, because of my lupus, my lungs are damaged; and so I have something -- bronchiectasis. So most people can relate to cystic fibrosis. They call it non-cystic fibrosis bronchiectasis. So your lungs lose the ability to clean themselves; and so people with cystic fibrosis -- you do breathing treatments several times a day with saline to clear it. You wear a vest for compression. You have to do these things to clean your lungs every day, twice a day.

With that, you're more susceptible to infections, and I came down with a nasty NTM. You hear about all these bugs, right? You get something called non-mycobacterium tuberculosis. It's a cousin of tuberculosis. It's not contagious, but it's much harder to treat. It's very, very difficult to treat. And so I had seen specialists at National Jewish Health. They're in Denver. They're the best in the country on that specific thing. I'm fairly young to get it. Most people are older when they get this, but because my lungs are compromised -- and the lupus -- so you go on a three-antibiotic drug treatment. I was going -- when I went out on leave, I was going through that drug treatment -- those breathing treatments -- a lot of coughing; a lot of issues; side effects, maybe,

from the drugs. Like, three antibiotics -- at that time, I was doing it three days a week. You do it until you get a clear sputum sample. Once you do, you stay on it for a year; so it's a long haul, which then also made me very susceptible to COVID, flu, any of those things.

And so being able to continue to work remote also helped with that because I'm not exposed to that, especially when I was still being treated with the antibiotics. I think that answers your question.

Q. Yes. Thank you very much. So we talked about the July to October leave of absence. That was for the lungs?

A. Yes. That was the last end of doing all of the treatments, trying to get to the end of that round of antibiotics.

Q. How was your relationship with LeRoy Davis?

A. It was good.

Q. Did you have any reason to think that he was not supportive of your work-from-home accommodation or any medical leave?

A. I do not have any reason. My belief is that it was Steph Silva that pushed him. I have no reason to believe that he was lying when he said HR made him do it.

Q. And all of them moved under Preeti? Even the ones who had been reporting to CIB?
A. Correct.
Q. How many people were impacted that had been reporting to you?
A. I don't remember the exact number, but I would say a handful. Maybe five.
Q. In terms of your direct reports and the number that decreased as a result of this restructure, it was for you, in terms of your direct reports, a net loss of around five or more?
A. It could be more.
Q. Okay. But whoever was on that deposit forecasting team as a direct report to you is who was moved over to Preeti?
A. That's correct.
Q. Was anybody else moved anywhere else in terms of your direct reports?
A. No.
Q. Do you remember who the people who had been in that function reporting to CIB -- do you remember who they reported to at the time before reporting to Preeti?
A. They, I believe, were reporting to Jing.
Q. That's why you were having conversations

that. But I was told specifically from Jamey that Marc has already made the decision; so I assume it was Marc Winneford.

Q. Did Jamey tell you when Marc made the decision?

A. It was during the course of those back-and-forth phone calls at the very end when he said, "They're moving out, but they want you to update the business case," or something along those lines.

Q. What time frame was that in the course of your leave of absence? Was that close to your return or --

A. It would have been close to the return. It would have been probably in September, if I recall correctly. It was fairly close to when I was returning. It was either the end of August or in September.

Q. Is there any reason for you to believe that that change in terms of the reporting structure was because of your leave of absence?

A. The timing of it happening leads me to be very suspicious. The requests -- what does this mean for me? -- I've worked when these things happen and there are reorgs. We typically know who our strong players are. "I've got an 'exceeds' on my team. We're

going to move this." I'm going to give an example. I'm making this up. "Hey, Philipe, you're a strong player. We've got you," which is what Marc Winneford did for me when he called me the year before. "You're going to be okay. Just be patient. We've got something coming. It's all going to be okay." That's just what you do, right? You give, as we call it, a bear hug. You give them a good bear hug and make sure they know they're okay. And that didn't happen. I mean, it was just "Hey, what am I going to do? You layered me. You took away half my team. And then by the time January comes, you give me a 'meets' and say there weren't data points; and then you cut my comp," right? It's like, well, "Hey, you're my highest paid team member." I said, "Well, of course I am. I was your peer. Of course I'm going to be your highest paid team member now," right? And I said, "Jamey, how did this get to this without you communicating before year-end?"

As a manager, you have those midyear conversations; and if it's trending and you think that somebody is not going to get there, I start messaging that as soon as possible so that there's no surprise between us at year-end. I've been managing people my entire time at Wells Fargo. I have been treated with

that respect all the way up until this. I've never had a situation where it was handled this way. I have never reduced somebody's comp by that much, ever; and I have been managing managers and managers. It just doesn't happen. I'm like, "Hey, help me understand the messaging here because there's a message. This doesn't just happen." I could see, "Okay. You're a 'meets.'" I've been around a long time. Sometimes there's wiggle room. "Hey, we have this person that's going to be promoted. We need to give them 'exceeds,' and we're going to hit our cap; so we can't go over our percentage of 'exceeds.' So you're a 'meets,' but you're a 'meets plus-plus,' and comp works out the same. There's maybe a slight differential in your 'exceeds,' but you're a 'meets plus-plus.'" That's how it works.

I've never, in 20 years -- now 21 -- had to go and cut somebody's compensation. I've had people that were on PIPs; and the first step was they get a flat and I have a conversation and be like, "Hey, it's going to continue to go down if you continue to not improve," right? If we have messaging, it's not a surprise. It's not out of nowhere. "Hey, you're an 'exceeds.' Oh, you're a 'meets.'" You know, I kind of -- I pushed back on the "meets," but it wasn't until

I saw the comp that I'm like, "Wait a minute. You cut my comp?"

He said, "Yeah. 7 percent." It was almost like he was proud of it.

I'm like, "Jamey, this is so wrong. You have to give me a message with this."

"Well, there just weren't enough data points."

I said, "That doesn't help. That tells me you didn't have data points because I was out on leave." Somebody have a conversation with me. Be respectful to me as a 20-year employee who's exceeded all but one year, and that was a year that I worked for a guy who's retiring. We won't talk about that. But I did get comped.

You don't do this to people. You don't do this without a conversation. If there was a true reason for lowering it, give me that hard message. And I said to him exactly, "Jamey, I'm a professional. I know if there's a message here. You can tell me. I want to do well." And he said it again. He probably said it four times on that call.

"The only thing I can tell you is there's not enough data points."

Q. When the team was moved over to Preeti, did

rating?
A. I do not, even though I've requested and asked for it.
Q. Do you know who you were assessed against on the finance team in that calibration session in 2022 for the year-end performance rating scores?
A. I do not know. They told me they calibrated against the broader group. I was like, "Well, tell me who because I am the only treasury senior finance manager in this group. Who did you calibrate me against?"
Somebody that is a line of business finance direct support and has a line of business direct interaction and can get feedback from the line of business and works with them is very different than working with the line of business finance people to translate their business forecast and strategy into and through the tools and systems that feed corporate treasury and finance and have that view into treasury and the impacts that that change and those changes and loan balances are going to have on CCAR, on capital, on liquidity -- all those things that, even in the job description, are very unique and distinct and what that background is and the requirements for those roles are.
Q. You mentioned earlier that you felt like

Ms. Michelle, for identification of the page?
MS. GESSNER: I think, to be clear, you're showing her what you've marked as Exhibit 20; is that correct? And it's Page 18 of Exhibit 20?
MS. SATTERFIELD: Exhibit 20, PDF Page 18.
MS. GESSNER: Okay. Thank you.
MS. SATTERFIELD: Sure.
BY MS. SATTERFIELD:
Q. And so on the second row is where it indicates that there is a bonus paid at the end of January of '23 in the amount of 146,250. Do you see that, Ms. Arbuckle?
A. I do see that.
Q. Okay. Any reason to dispute that amount, or does that help you recall that that's the amount you received in bonus that year?
A. I think so. Yeah. Sometimes the dates are weird. Sometimes they show up as year-end, and sometimes they show up in January; but I think that's correct.
Q. Okay. And the page is cut off because it looks like maybe you took a picture -- a screenshot or whatever -- but you'll see where I saw, under the reason, "one-time discretionary restricted bonus." And

so my question is: Do you know what the factors are for discretion in paying out the bonus, or do you know what they were in January 2023?

A. So the bonus has always been discretionary. It's a significant piece of my compensation. It's almost half. So my bonus has always been discretionary. It's discretionary as the performance of the company, the performance of the business you're in, and your performance.

Q. And that was going to be my next question -- whether it -- I'm going to stop sharing. I might come back to that page in a minute, but I don't have any other questions right now about it.

You mentioned something about there being some sort of tie to the performance rating. Is that spelled out anywhere, to your knowledge, that the discretionary bonus is correlated to whether you receive a "meets" or "exceeds" or the amount change is based on your rating?

A. I don't know that I've ever seen anything in writing; but every single year that we've calibrated our team, we have calibrated people together based on their ratings. "Here's your group of 'meets.' Here's your 'exceeds.'" Every manager I've worked for has done that calibration with their directs on that. You

whether they were a "meets, exceeds, or consistently exceeds." Everybody got more.
Q. Do you have any way to calculate what you believe you would have gotten had you gotten an "exceeds" rating for your total comp?
A. At a minimum, what I got the year before. If my whole team was at least flat to up, I was expecting flat to up.
Q. Who did you first complain to internally about the performance rating for the year-end 2022?
A. Jamey.
Q. And was that in the conversation about the rating or later?
A. It was absolutely in the conversation. I was shocked.
Q. And after that, I understand that you made some additional complaints about the performance rating. Tell me about that -- who you complained to and --
A. Do you mean after talking with Jamey about my concern about the performance rating?
Q. Yes.
A. Yeah. Well, I talked to Jamey again when the compensation conversation came, which the rating is a component of that. And then I talked an attorney

have not been told at this point that that has anything, but I just don't know."

I do believe me being remote in the system and when a hiring manager pulls up and sees candidates -- "Oh, this one is remote. Well, I'm not dealing with that because we're getting pushback on getting rid of the remote team members."

Q. Do you know if that happened with respect to your application to either of these two positions in 2022?

A. Do I have proof of that?

Q. Right.

A. No. Do I think it's highly likely, and do I believe that's what happened? Yes. I did not even have an interview.

Q. Do you know if Jamey Escaler participated in the decision about who to advance for either of those positions in October or November 2022?

A. He would have had no participation in either of those.

Q. What about Steve Macko? Would he have had any participation in either of these roles and who advanced?

A. You know, that's a great question. Yes. I think he could have and likely did. Sometime within

accommodation is specifically for -- well, at least at the time I applied and was approved, it said it's for the role. I believe that's changed now because now they're sending these reapprovals every month. I'm afraid to go get another job. I get the job and then go through accommodations, and they're going to say, "No, not for this role." I'm afraid they're going to cut it. I have it, and I have it for this role. There's no guarantee, if I apply for another role, that it would be approved.

Q. In terms of your accommodations, is there anything else you need to perform your job working from home that you haven't been given? Is there anything else that you would need for the eye issues or the spotting or anything like that that you would need for other accommodations to perform the role from home?

A. No, not at this time.

Q. And you know how to go forward and ask for any additional accommodations moving forward?

A. Absolutely.

Q. Okay. Good. In terms of your system access being disabled in June 2023, tell us about that.

A. So I was midday working sometime between -- I don't know -- noon and 3:00 -- and I just lost all access -- complete access. I called technology, tried

to get help. Technology -- and I can't remember the sequence of the conversations -- I have it written down somewhere -- but, basically, they said they couldn't even find my ID. They said, "You're not in the system. Let me call tech connect and give them your number. They can look it up and tell you what your issue is." They said, "You're not even in our system. We don't have you as an employee." And so I texted Jamey and Amy, our admin, on my phone.

I'm like, "Hey, I just lost all access. Complete access just gone."

And so Jamey worked with somebody, contacted -- whatever. Ultimately, I got my access up sometime that week. And then once I had access into Wells Fargo, I was missing all of my applications; so now I can't get anything done. I'm spending days on the phone with the help desk, talked to somebody on the help desk and said, "Hey, what's going on? Jamey is saying that this is a widespread issue."

The tech guy said, "Well, I would know if there was a widespread issue, and I know of no other issue. This is because you were on the terminated or displaced list."

I was like, "What?" I told Jamey, "No. This is not a termination. This is not a displacement.

A. So the Preeti thing happened in the end of 2022. And then the end of '23 -- because I told Heather, "Hey, I'll do whatever you want. I'll take the trash out for you. I recognize you as a leader. We were peers for a long time; but I do recognize you, and I will support you and the team to perform."

So she knew I wanted something, and so she -- my understanding is she told Steve, "Hey, there's this group of people whose manager is leaving. Why don't we give that to Beth?" And so that team of one, two, three -- four or five people -- I think it was five -- moved under me, and I was super excited. That was the end of '23. I'm like, "Okay. Maybe this is a sign. Maybe this has been making some reconciliation in this process. Now I can do something." And then sometime within six months -- less than six months -- the function that we supported was moved to another group -- CIB. They're going to take over what we were doing. Two of the people were on location optimization. And since then, I had conversations with Heather before she left. I'm like, "Hey, Heather, there's nothing left here. I have this person I just hired, but what is our mandate? I've been asking for two years. What is our mandate?"

There's been so much movement with this

years. Would you agree with that? Like, moving around a lot?

A. There has been a lot of reorganization across finance, which, again, had I not made my formal complaint, I feel -- all the experience and everything I've gone through that we've talked about -- from my comp to being on the list and getting my tech cut off -- had I not made this formal complaint, I would have been reorged out, and no one would have been the wiser -- because there are some reorgs.

And this is not unique to right now. I mean, if you've worked in the banking industry, obviously. This has been going on since I started with Wachovia. This happens through cycles, not just with what we're experiencing today.

Q. And then in January 2024, you had to take another medical leave of absence?

A. Correct.

Q. And that was through March of 2024?

A. It was, yes.

Q. Did anybody contact you about work-related matters during that leave?

A. Only Heather contacted me with timing of when I was coming back and that there were some changes to her team, and she was trying to figure out that

structure. It was late in the leave, probably within the last month, confirming the timing and the dates. I think that she even called once to check on me to make sure I was doing okay.

Q. So from your perspective, there was nothing inappropriate about her outreach during your leave?

A. No.

Q. And the leave was approved?

A. Yes, it was.

Q. Was that also 100 percent paid through short-term disability?

A. Yes. It was, yes. It was considered short-term disability, and I guess they forced it to overlap with FMLA. And the short-term disability benefit, that's part of our package that we get short-term disability. I believe the premiums are paid by Wells Fargo, but the payment actually comes from Lincoln Financial during that period.

Q. Have you had to take any other medical leaves other than the ones we've talked about?

A. Since 2022, no.

Q. Just those two? One in '22 and one in 2024?

A. Correct.

Q. You talked a few times about Steve

if you want to add to anything you testified to previously, please stop me; but I think you've testified to each of these points. Just let me know if you want me to stop anywhere, too.

A. I feel like we've covered all of those.

Q. And that's your signature on each page obviously, correct?

A. Correct.

Q. Okay. And it ends with Number 26. You go through the performance rating and the compensation decision and then say that you believe that's discriminatory and retaliatory -- all of the things that precede that last paragraph, correct?

A. Correct.

Q. That's the end of the document. Did you file any other charges of discrimination after this one? After July 18th, 2023, have you filed any other charges of discrimination?

A. No. Just the internal one before this formal, yes. No, this is it.

Q. Okay. I'm going to find the internal -- the e-mail about the internal complaint.

I'll come back to that in just a minute, but is it your recollection that you're -- when you talk about internal, you're talking about the internal

complaint of retaliation related to the performance rating and compensation decision?

A. Correct.

Q. And you made that complaint before filing the EEOC claim?

A. Correct.

Q. What prompted you to file the claim with the EEOC?

A. The fact that I was just responded with "We found no" -- through my internal complaint and the response that "We've reviewed this. We can't tell you why. Rest assured, we care for it." I could tell that it was ongoing, right? I wasn't being included in meetings, and my system disconnected. I knew that I needed to make it formal. I knew that everything changed from the day that my accommodation was approved. Everything changed -- my career trajectory, layered, my compensation. Now Jamey is leaving. I had to. I felt like I had to protect myself, and it was wrong.

Wells Fargo did their own investigation and didn't recognize it. And, quite frankly, in their investigation they would have had to go talk to those managers. If I was completely off base and I was completely wrong in all of this -- "No. Listen. This

office? How come he can be here some days and not others? He can't be an 'exceeds.' He doesn't even come into the office." Not only did I experience it myself, I saw it firsthand with my team members; and me trying to advocate for him without telling him, "Hey, Philipe, when you're in the office, make sure you're visible to Steve. Go by and say 'hi.'" But I'm not going to tell him all this is happening behind the scenes, but I know it is. It's made it a challenge to manage my team.

So all of that in addition to -- it's taken so long to resolve this. Somebody could talk to me in 2022. Steve could have called me and said, "That's not why this happened." I filed the EEOC complaint. We could have went to mediation. It didn't happen. I had to force, basically, to keep this going because I knew when I got up, I was going to get gone through the reorganization.

I've been with the bank over 20 years. I know how this stuff works. And so this has been going on for how many years of my life? It's very emotionally difficult. It's sad. It's humiliating. It's taken away a career that I worked 21 years for. I went to college. I got a four-year degree, went to school at night to continue to better my education and