# Exhibit B

## Wells Fargo 30(b)(6) Deposition Transcript

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No.: 3:24-cv-01068-FDW-SCR

BETH ARBUCKLE,

Plaintiff,

-vs-

WELLS FARGO BANK, N.A.,

Defendant.

\- - - - - - - - - - - - - - -

VIDEOCONFERENCE VIDEO DEPOSITION

OF

**WELLS FARGO BANK, N.A.**

Through its Rule 30(b)(6) Designees

November 18, 2025


**Michelle S. Thompson**
**THOMPSON & MILLS COURT REPORTERS**
michelle@thompsonmills.com
**5425 Closeburn Road, Unit 311**
**Charlotte, NC 28210**
**704.564.5249**

ones who complain, correct?
MS. SATTERFIELD: Objection, outside the scope.
A. Yes.
Q. (By Ms. Gessner) Now I'm going to show you what we've marked as **Exhibit 1** to this deposition. Do you see a document on the screen?
A. Yes.
Q. And --
MS. SATTERFIELD: What's the Bates range?
Q. (By Ms. Gessner) This is a document that was produced in a different case. Do you have any understand as to why Wells Fargo would not produce the employee handbook in this case?
MS. SATTERFIELD: Michelle, what's the Bates range?
Q. (By Ms. Gessner) Ms. Frakes, will you please answer the question?
MS. SATTERFIELD: Michelle, is there a Bates range?
MS. GESSNER: No, there is not.
Q. (By Ms. Gessner) Ms. Frakes, answer the question, please.
MS. SATTERFIELD: Objection, outside

A. Not to my knowledge, no.
Q. And is there a policy in Wells Fargo's handbook that says if we get too many requests we're not going to follow the law?
A. Not to my knowledge, no.
Q. You're aware that Wells Fargo did not respond to Mrs. Arbuckle's request for an accommodation for 13 weeks; true?
MS. SATTERFIELD: Objection to the form.
A. She was provided a temporary accommodation during the 12 weeks that -- or the six to 12 weeks that she was notified the case would be delayed.
Q. (By Ms. Gessner) Ms. Frakes, that wasn't my question. Let me ask it again.
Isn't it true that Wells Fargo did not grant Mrs. Arbuckle's accommodation request for 13 weeks from the day she answer -- she requested it; true?
MS. SATTERFIELD: Objection to the form.
A. At that time in 2022, temporary accommodations were provided for employees who requested work from home. To my knowledge, she was -- requested the temporary accommodation to work from home as needed.

Q. (By Ms. Gessner) Again, nonresponsive. Did Wells Fargo --
MS. SATTERFIELD: It is responsive. She answered your question twice.
MS. GESSNER: Madam Court Reporter, please note the improper objection.
Q. (By Ms. Gessner) Ms. Frakes, Mrs. Arbuckle was not told --
A. She was provided a temporary accommodation.
Q. Let me finish my question. Let me finish my question for the record.
Mrs. Arbuckle was not given the surety and assurance that she was going to have an accommodation approved by Wells Fargo for 13 weeks from the date she asked; true?
MS. SATTERFIELD: Objection to the form.
A. She was provided a temporary accommodation to work from home as needed during the six-to-12-week period that was -- her case was delayed.
Q. (By Ms. Gessner) Where in the Americans With Disibilities Act does it say that a company can provide a temporary accommodation?
MS. SATTERFIELD: Objection to the form and outside the scope.

Q. (By Ms. Gessner) Ms. Frakes, you can answer it.
MS. SATTERFIELD: If you have personal knowledge.
A. I don't have personal knowledge.
Q. (By Ms. Gessner) Ms. Frakes, isn't it true Wells -- that the Americans With Disibilities Act does not allow temporary accommodations just so that Wells Fargo can get --
MS. SATTERFIELD: Objection to the form and outside the scope.
Q. (By Ms. Gessner) -- true?
MS. SATTERFIELD: Objection to the form, outside of scope.
A. At that time we provided temporary accommodations due to the high volume of cases. I don't know how differently you want me to answer the question. It was what we had done across the board due to a high volume of cases. We received over 10,000 I believe at one time within a matter of a few weeks, and so a staff of 25 to 30 people were doing the best that they could, and to my knowledge she was provided a temporary accommodation to work from home as needed.
Q. (By Ms. Gessner) Ms. Frakes, that was not my question. Let me ask again. You've ben designated

A. I believe so, yes.
Q. (By Ms. Gessner) And so if an employee has an accommodation for a disability and they're appearing on this return-to-office in a negative way, do you know why, right?
MS. SATTERFIELD: Objection to the form and outside of scope.
A. If they had a concern about appearing on that report and they had an open accommodations case, as a consultant I would reach out to the manager and let them know that we had something pending and that they would -- they would be able to disregard the report during this period of time.
Q. (By Ms. Gessner) And that's only if they had reached out; true?
A. Yes.
MS. SATTERFIELD: Objection to the form, outside of scope.
Q. (By Ms. Gessner) And so when these employees were on the temporary accommodation, they did not have an official accommodation designated in Wells Fargo's systems; true?
A. Yes. True.
Q. And so people who did not have official designations in the system were not showing up as

A. Correct.
Q. (By Ms. Gessner) And I think we talked about it. Once an accommodation is approved, the employee should be able to use that accommodation without any retaliation; true?
A. Correct.
Q. And so there's no provision at all in Wells Fargo's policy that says we'll approve your accommodation but then we're going to punish you for using it, correct?
A. Correct.
Q. Now if employees were showing up who had temporary work-from-home accommodations but had not been given their approved accommodation and are showing up on this return-to-office report, that could affect their performance rating; true?
MS. SATTERFIELD: Objection to the form and outside the scope of designated topics.
A. It should not, no.
Q. (By Ms. Gessner) It could, though, right?
MS. SATTERFIELD: Object to the form; outside of scope.
A. Employee relations consulting would tell managers that it should not, no.

Q. (By Ms. Gessner) And during that timeframe Wells Fargo's testimony is that she was not granted an accommodation but she had temporary permission to work from home during that 13-week period, correct?
MS. SATTERFIELD: Objection to the form.
A. Yes.
Q. (By Ms. Gessner) So my question is, during that 13-week period she should not been showing up on a failure-to-return-to-office report, correct?
MS. SATTERFIELD: Objection, outside of scope.
A. There wasn't any kind of reporting in place for us to say that these people had temporary accommodations, so if she was not returned to the office, then my understanding is that she would have been on that report.
Q. (By Ms. Gessner) Now Wells Fargo can create any kind of reporting it wants; true?
MS. SATTERFIELD: Objection, outside of scope.
A. I have no idea.
Q. (By Ms. Gessner) Well, ma'am, Wells Fargo could have reported all employees who had temporary approval to work from home to all managers if it

people who were not returning to the office, correct?

MS. SATTERFIELD: Objection to the form.

A. I wouldn't categorize it that way.

Q. (By Ms. Gessner) How would you categorize it?

A. There was a return-to-office report that was produced and given to managers to allow them to see who was making it into the office and how -- how often they were making it into the office.

Q. And prior to Covid such report did not exist; true?

A. I don't believe it -- I don't believe it existed before Covid.

Q. And the return-to-office reporting that you just described did highlight those who were not coming in a certain amount of days, correct?

A. It highlighted people and how many days of -- how many days they were coming into the office.

Q. Again, it wasn't just coming in, not coming in. It was how many days they were coming to see whether it was one day, two days, five days, seven days, correct?

A. Yes.

Q. And those who were not coming in at all were highlighted in yellow, correct?

office.
Q. (By Ms. Gessner) And so again, they weren't just sending out this return -- this return-to-office report and expecting managers to do nothing, correct?
A. They were expecting their managers were going to go have conversations with their employees.
Q. And find out why people weren't coming back into the office; true?
A. True.
Q. And the failure to not come back in was a problem, correct?
MS. SATTERFIELD: Objection to the form.
A. At that time there was no -- there was -- the intent was really just to find out why were they not coming into the office.
Q. (By Ms. Gessner) Again, you say at that time. Has it changed?
A. Yes.
Q. What's changed?
MS. SATTERFIELD: Objection, outside of scope.
A. That we're further along in the process, and so, you know, they have conversations with the

return to office, that could be seen as retaliation; true?

MS. SATTERFIELD: Objection, outside of scope. And objection as to form.

A. I -- I don't know what the perception would be.

Q. (By Ms. Gessner) Now who made the decision to put Beth's name on the failure-to-return-to-office report?

A. I don't think anyone specifically put Beth on the return-to-office report. I think it was just a broad data reporting that was produced and her name was on it.

Q. We talked about that with Mr. Frakes a bit. Wells Fargo had the ability to check that report against those who had temporary accommodations; true?

MS. SATTERFIELD: Objection, outside of scope.

A. I'm not -- I don't know.

Q. (By Ms. Gessner) Again, you can use common sense. Wells Fargo, before issuing those reports to managers, could have gone to an accommodations management consultant and said is there anybody on these reports who you're working with to get an accommodation; true?

MS. SATTERFIELD: Objection, outside

A. Yes.

MS. SATTERFIELD: Objection, outside the scope.

Q. (By Ms. Gessner) Do you have any reason to dispute Mrs. Frakes' testimony?

MS. SATTERFIELD: Objection, outside the scope.

A. Can you repeat your question again?

Q. (By Ms. Gessner) Do you have any reason to dispute Ms. Frakes' testimony?

MS. SATTERFIELD: Objection, outside the scope.

A. No.

Q. (By Ms. Gessner) And even with your timeline of May, June, and November of 2022, all of those dates are after March 15, correct?

A. Yes.

Q. Now who made the decision, any of the three, to reorganize Beth's team?

MS. SATTERFIELD: Objection, form.

A. LeRoy Davis made the decision on her move to -- her and her team's move to Jamey Escaler, and I believe Marc Winniford, Steve Macko, LeRoy Davis were decision-makers for the move to -- for the move later in the year in November.

Q. (By Ms. Gessner) And Beth's movement from temporary accommodation was changed in June of 2022, correct?

MS. SATTERFIELD: Objection, outside the scope.

Q. (By Ms. Gessner) Correct?

A. I believe so, yes.

Q. And so she was moved, after making the request, down and then she was moved again once the accommodation was in place, correct?

MS. SATTERFIELD: Objection, outside the scope.

A. I mean, technically, yes.

Q. (By Ms. Gessner) And each of these reorganizations diminished her job each time; true?

MS. SATTERFIELD: Objection to the form.

A. I don't believe that her job or the scope of her role was changed when she moved from LeRoy Davis to Jamey Escaler.

Q. (By Ms. Gessner) Assuming what you say is true, do you believe that the scope of her role was changed with the other two movements?

A. I believe that her scope of her role was changed with the last movement that happened later in the year.

she had been out and she didn't have any data point in which to evaluate her compared to her peers. Now does Wells Fargo allow managers to mark employees down when they're out on FMLA?

MS. SATTERFIELD: Objection, outside of scope. And objection as to form and foundation.

A. I don't know how to answer that question because I wasn't a part of those -- those conversations.

Q. (By Ms. Gessner) So again, did you -- did you in your -- did you have a calibration meeting regarding Beth Arbuckle where you recommended that should be lowered from exceeds expectations to meets?

A. We had a calibration meeting as a team where there's discussion about all employees.

Q. My question is specific about Beth Arbuckle. Did you have a meeting with Steve Macko and others above Steve specifically choosing to lower Beth's rating from exceeds to meets expectations?

A. We did not.

Q. Whose decision was it to change her rating?

A. It was a conversation between Steve and Jamey.

Q. Were you part of that conversation?

A. There were many conversations going back and forth

leadership skills, highly effective, nothing in the evaluation to reduce her evaluation, why was she reduced?

MS. SATTERFIELD: Objection to the form; outside of scope.

A. I'm not sure.

Q. (By Ms. Gessner) Now you said you were in those calibration meetings with Steve Macko and Jamey Escaler. Do you recall hearing anything about why she was reduced?

A. I don't recall.

MS. SATTERFIELD: Objection to form and outside of scope.

Q. (By Ms. Gessner) I didn't catch your answer, Ms. Silva.

A. I said I don't recall.

Q. Now when Mrs. Arbuckle's rating was reduced, her compensation also was reduced; true?

A. Yes.

Q. And so at Wells Fargo, ratings drive not only your raise but also your bonus and your long-term equity; true?

A. It's one component of it, yes.

Q. Again, it's a large component, is it not?

A. Well, there are several components into going into

making up your total comp.
Q. And again -- well, let's talk about it. Do you know how much Mrs. -- well, you are designated to know. How much was Mrs. Arbuckle's compensation reduced in 2023 because she did not get an exceeds rating?
A. I believe it was approximately seven percent.
Q. And how much was that?
A. I don't remember the exact dollar figure off of my head.
Q. Approximately what was it?
A. I don't -- I don't even want to guess. I don't know. Approximately seven percent.
Q. And Mr. Escaler had reduced her pay by $40,000 initially; true?
A. I don't recall the dollar amount.
Q. I'm going to share what we've marked as **Exhibit 6**. You see a document on the screen?
A. Yes.
Q. What is this?
A. I don't know.
Q. Take a look at it.
MS. SATTERFIELD: What Bates range is this?
MS. GESSNER: 3060.

$49,000, correct?
A. I believe that's what it says, yes.
Q. Well, it says 40 and nine, right?
A. I know. I just -- yes.
Q. Does this help refresh your recollection as to what Mr. Escaler reduced Beth's pay before submitting it to Macko before November 28, 2022?
A. Can you say that again?
Q. Does this refresh your recollection as to the amount of money that Mr. Escaler had reduced Beth's pay before submitting the increases to Mr. Macko?
A. Yes.
Q. And you were involved insomuch that he was instant messaging you; true?
A. Yes.
Q. You recall any other conversations about the amount of money that Beth's pay was reduced as a result of the exceeds expectations changed to meets?
MS. SATTERFIELD: Objection to the form.
A. No.
Q. (By Ms. Gessner) Now we've already talked about it, but the rating was directly tied to her compensation, correct?
A. It's one of several components of compensation.

which is seven percent, but I think your question is different than what you asked me, so I just want to be sure that I'm very clear.
Q. (By Ms. Gessner) Okay. Well, understand -- explain the question you think that I want answered.
A. Well, I don't -- I don't know. That's why I'm --
Q. So I'm asking you, as a 20-year senior HR leader with Wells Fargo, at review time isn't it true that employees are communicated increases based upon a certain percentage over their current pay? They either get a two percent raise, a three percent raise, a 10 percent raise, correct?
MS. SATTERFIELD: Objection to the form.
A. No.
Q. (By Ms. Gessner) How is it then that Wells Fargo decides increases?
A. So there's a lot of components that go into it.
Q. Tell us about all.
A. Sure. So there's the company performance, there's the business performance, there's individual performance, and then you look at where the person is relative to their peers and the market.
Q. Okay. I understand that those are the things that we look at when we're deciding compensation. I'm



Case 3:24-cv-01068-FDW-MTO Document 23-2 Filed 01/08/26 Page 19 of 42

or percentages with leaders?
A. Both pieces of information are on the page.
Q. So what was Mrs. Arbuckle's raise, if any, in 2023?
A. I believe she was down total comp seven percent.
Q. So she didn't get a raise, correct?
MS. SATTERFIELD: Objection to the form and outside the scope.
A. She was down seven percent.
Q. (By Ms. Gessner) And common sense would say if you cut someone's pay, then next year any decisions made about the next year's pay is also based upon the current year's, correct?
MS. SATTERFIELD: Objection to the form.
A. No.
Q. (By Ms. Gessner) Okay. On what basis do you say no?
A. It's a data point that you look at when you start, but then you factor in some of the other things that I just spoke about, and then that's how you get to a new number.
Q. So as you sit here today under oath, has Wells Fargo ever given Mrs. Arbuckle a large increase in pay to make up for all of the pay that was reduced from her when her pay was cut in January of 2023?

MS. SATTERFIELD: Objection, outside the scope.
A. Not to my knowledge.
MS. SATTERFIELD: Michelle, we need a break.
Q. (By Ms. Gessner) Every year --
MS. SATTERFIELD: Michelle, we need a five-minute break.
MS. GESSNER: When I'm finished with questions -- next two questions we'll take a break.
Q. (By Ms. Gessner) Every year that Mrs. Arbuckle is behind because of that seven percent reduction, it impacts her current pay, correct?
MS. SATTERFIELD: Objection to the form.
A. I don't believe so.
Q. (By Ms. Gessner) Again, common sense would say if you get a seven percent reduction and future pay is based upon current pay, there's automatically going to be a reduction overall; true?
MS. SATTERFIELD: Objection to the form.
A. I don't believe so.
Q. (By Ms. Gessner) Why do you not believe so?

A. Because they could make her pay anything they want.
Q. Understood, but they haven't, correct?
MS. SATTERFIELD: Objection to the form.
Q. (By Ms. Gessner) They have not ever increased her pay to make up for the money that they took away from her in January of 2023, correct?
MS. SATTERFIELD: Objection to the form and outside the scope.
A. Not to my knowledge.
Q. (By Ms. Gessner) I have just a couple more questions on compensation and we'll take a break.
I think it's your testimony -- and let's take aside -- every company uses -- whether the company is doing well and these data points. I'm simply talking about for this question her current salary at the time that a decision is being made.
So future raises, in order -- if her base was higher, any future raises that are a percentage of that base would also be higher; true?
MS. SATTERFIELD: Objection to the form and outside the scope.
A. I don't -- I don't know.
Q. (By Ms. Gessner) Well, how about common sense? If somebody makes $100,000 and they get a 10 percent

raise, they're going to get $110,000; true?

MS. SATTERFIELD: Objection to the form; outside the scope.

A. Yes.

Q. (By Ms. Gessner) And if somebody makes $50,000 and they get a 10 percent raise, they're only going to get $5,000 more; true?

MS. SATTERFIELD: Objection to the form; outside the scope.

A. I guess.

Q. (By Ms. Gessner) So again, that base compensation is important when calculating increases on a percentage basis; true?

MS. SATTERFIELD: Objection to the form and outside the scope.

A. Can you say that again?

Q. (By Ms. Gessner) Yeah. The base pay is important when calculating increases on a percentage basis; true?

MS. SATTERFIELD: Objection to the form and outside the scope.

A. It's a factor.

Q. (By Ms. Gessner) Okay. And in fact, the bonuses being paid by Wells Fargo are a large part of executive leader compensation, correct?

Arbuckle is not being fired?

MS. SATTERFIELD: Objection to the form and outside the scope of designated topics.

A. I don't -- I don't see anything on the email.

Q. (By Ms. Gessner) As we get up here -- let's keep going -- we've got this question about the timing, and Mrs. Wesson responds to Mr. Escaler and says June 13, 2023. Do you see that?

A. I do.

Q. And that was the date in which Mrs. Arbuckle was supposed to be fired; true?

MS. SATTERFIELD: Objection to the form and outside the scope of designated topics.

Q. (By Ms. Gessner) True, Ms. Silva?

MS. SATTERFIELD: Same objections.

A. It appears to be the notice date that Susan gave him.

Q. (By Ms. Gessner) And in response to notifying Beth of her termination, correct?

MS. SATTERFIELD: Same objections.

A. Yes.

Q. (By Ms. Gessner) He says, Thank you. Look forward to connecting. There's an invite. All right.

form.

Q. (By Ms. Gessner) And then up above, on June 13, 2023, is when you're getting this email from Mr. Escaler. Do you see that?

A. I do.

Q. And it says, Today was the original displacement date.

Do you see the highlight?

A. I do you see your highlight.

Q. Now what could that mean other than today was the original termination date?

MS. SATTERFIELD: Objection to the form.

A. That -- that is the original termination date, but we had not made the decision to terminate her, which is why she's still here.

Q. (By Ms. Gessner) And again, we talked about that.

A. Okay.

Q. You do not remember why, but for some reason you and Steve and Steph recommended moving it out to July. Do you see that?

A. I do.

Q. Highlighted. Okay. And again, they counted on you to get the date changed in the system. It didn't happen, so she gets -- her access gets turned off

documents to authenticate for this case, did you see a single document that told Mrs. Arbuckle that she was going to be fired on June 13, 2023, but somebody had decided to delay it?

MS. SATTERFIELD: Objection to the form.

A. I don't recall that.

Q. (By Ms. Gessner) In fact, you saw, and we'll show in a minute, documents where Mr. Escaler outright lied to her and said that it was a system issue affecting many people; true?

MS. SATTERFIELD: Objection to the form.

A. I believe that's actually a true statement.

Q. (By Ms. Gessner) And so telling her that this was a system issue that affected many people was false; correct?

MS. SATTERFIELD: Objection to the form.

A. That is not false.

Q. (By Ms. Gessner) Again, Mrs. Arbuckle, her system was turned off and he claimed it was a mistake, that she should not have been included, but yet her date for termination was actually set on the exact day that her access was turned off, correct?

MS. SATTERFIELD: Objection to the form.
A. Her -- her system should not have been turned off and it was not just Beth that that happened to.
Q. (By Ms. Gessner) Ma'am, the difference, the people that it happened to actually got fired on June 13, correct?
MS. SATTERFIELD: Objection to the form.
A. To my knowledge that is not true.
Q. (By Ms. Gessner) So what's the basis of that knowledge?
A. During that time period like we had to figure out what actually happened because Beth was not slated to be displaced that day. And so there was a technology glitch of some sort where it turned the system off of several people, not just Beth, and they were not supposed to be terminated that day, just like Beth.
Q. And have you read all the documents in here that have been produced where IT says that's just fundamentally false?
MS. SATTERFIELD: Objection to the form.
Q. (By Ms. Gessner) Have you seen the documents that

IT says what you just testified about is fundamentally false?

MS. SATTERFIELD: Objection to the form.

A. I -- can you remind me what the documents -- I did -- like I reviewed tons of documents for this, so I apologize that something is not coming to memory.

Q. (By Ms. Gessner) So is that your testimony -- you cut off. Is that testimony that you're claiming, that what happened to Beth happened to other people and it was IT's mistake? Is that your testimony?

A. I'm just saying that what I was told was that this was a technology issue.

Q. So again, as of June of 2023, nobody had told Beth that she was going to be fired, correct?

MS. SATTERFIELD: Objection to the form.

A. Not to my knowledge.

Q. (By Ms. Gessner) I'm going to show you what we've marked as **Exhibit 11** to the deposition, and these are various Bates numbers. I'll read them off. 4634, 4625, 4612, 4613, 4614, 4615, 4616, 4617, 4618, 4635, 4665, 4666, 4667, 4636, 4637, 4638, and 4639. Now Mrs. Arbuckle was complaining about not having access and nobody told her the truth about

form and outside of scope.
A. It's correct, Ms. Gessner, that we did not inform her of our intent to displace her, that she was put on the displacement list, that she was considered for displacement. We did not inform her of that.
Q. (By Ms. Gessner) And even when she came in to work on June 13, 2023, and she didn't have access and she's wondering why I don't have access, nobody told her the truth, correct?
MS. SATTERFIELD: Objection to the form and outside of scope.
A. I certainly did not tell her the reason, Ms. Gessner, as to why her access was disconnected on -- on June 13.
Q. (By Ms. Gessner) Did you instruct Jamey Escaler to tell her the truth?
MS. SATTERFIELD: Objection to the form and outside of scope.
A. I don't have a recollection of instructing Jamey to tell her the truth.
Q. (By Ms. Gessner) Now Mr. Escaler claimed that you are the person who made him change her exceeds expectation rating down to meets; is that true?
A. That would have been a collective decision. There's a calibration --

Q. Who's the collective? When you say collective and it's not you, who's the collective?
A. No, actually, Ms. Gessner, it does include me. It would have been myself and Jamey and it would have been with an influence from other peer leaders in the context of how we evaluate what is exceeds performance, what is meets performance, what is consistently exceeds performance. So through our year-end calibration process, we would have spent time together as a leadership team evaluating our ratings for individual team members and comparing those ratings and the performance of those team members to others on the team of like positions, like roles, you know, like levels.
Q. And you saw the document where Mr. Escaler told HR that he didn't have enough data points because Mrs. Arbuckle had been out on FMLA leave for three of the six months; did you see that?
A. I did see that, yes.
Q. So when you say peer leaders and evaluating the entire team, it's fair to say that if Beth was out for three months she would not have the same data points as everybody else; true?
A. I really don't know what Jamey was referring to, data points. I do know that we assess a team

A. Not necessarily.
Q. So you would agree that cutting Mrs. Arbuckle's pay takes her down from where she had been; true? It's a cut in her pay. It makes her make less money each month, each pay period than she was making the year before; true?
A. No. We actually increased her salary in 2023, so the amount she was making each week, each month as you've described, actually went up in 2023, and that recommendation was made in concert with the bonus recommendation as well.
Q. Sir, you didn't understand my question and you're answering a --
A. I understood it.
Q. No, you didn't understand it. Let me say, when you chose to cut her from an exceeds expectations down to a meets, there was a $49,000 expected increase. Do you need me to put up the chat that you had with Mrs. Silva reflecting the $49,000 that had been proposed that she didn't get?
A. Ms. Gessner, I think it would be helpful if you pulled up that email because I don't believe that's the correct number.
Q. I'll do that in a second. Mrs. Arbuckle did not get the compensation level that she would have

gotten if she had been rated an exceeds expectations; true or false?
A. It's not a one-to-one correlation.
Q. Sir, did Mrs. Arbuckle get the compensation she would have get at a meets expectation that would have been given to anyone else at an exceeds? If she had been an exceeds expectations she would have gotten more money, yes or no?
MS. SATTERFIELD: And objection to the badgering as he was trying to --
MS. GESSNER: Okay. Keep calling it what you want. You've been badgering all day. I'm really tired of your speaking objections and saying something's badgering. I'm trying to move it along. You've taken away a long time. It's just insane how this has been.
MS. SATTERFIELD: When he didn't give you the answer you wanted --
Q. (By Ms. Gessner) So, Mr. Macko -- as Mr. Macko said, Mr. Macko, this is simple --
MS. SATTERFIELD: -- you raised your voice, started leaning into him in a hostile and threatening way and attempting to intimidate him.

Q. So was that so difficult? I mean, was that difficult? Mrs. Arbuckle was given less money in 2023 in an increase than what she had received both the year before and --
A. As were -- as were many other employees across all of finance and all of Wells Fargo.
Q. And at the time of these conversations, Mrs. Arbuckle had been -- had just come back from FMLA leave, correct?
A. Compensation conversations probably started in mid November, Ms. Gessner, so I'd have to compare that to when Beth came back from FMLA.
Q. Do you have any reason to dispute it was late September of 2022?
A. When she returned from FMLA? No, I don't have any reason to dispute that.
Q. So it was less than two months later in which these compensation decisions were made, cutting her pay, admittedly at least seven percent, correct?
A. It's two months to the point of time where we would have started having those conversations. It's iterative and it goes on for several weeks. It could have pushed into December, but the time -- but the time you've expressed sounds -- sounds like a reasonable timeline.

you had wanted or least gotten somebody to give you access; true?
A. I don't know the answer to that question because it never crossed my mind to look at their performance review back in 2023.
Q. So then after you phone screened Beth what did you do next?
A. So I guess to back up, I think that there was like 123 people that applied for the role, so I go through all of the resumes, and then I have a shortened list of folks based on their resume that I indicate, kind of flag, that I'm probably going to phone screen. I run that by the hiring manager. In this case it was Steve. And then I phone screen those folks. And then I always debrief with the hiring manager after the phone screens and review my recommendations or not, and then a decision is made about a first-round interview.
Q. Were there any other applicants for the job that had 22 years' experience at Wells Fargo?
A. I don't have all of them pulled up, but if you have them I can look at it.
Q. So I'm just asking you --
A. But -- but, you know --
Q. Do you recall anybody was as long-tenured and as

Brady Bunch screen. Any change to your testimony or the rules?

MR. HOTCHNER: No changes.

MS. GESSNER: Thank you very much. That would conclude the deposition unless Ms. Satterfield has some questions of you all.

MS. SATTERFIELD: Thank you, Michelle. I just have a few questions.

AMY FRAKES

BY MS. SATTERFIELD

Q. Amy, this is topic 2. This is about plaintiff's March 22 request for an accommodation. You were asked about plaintiff's accommodation. Will you please describe her accommodation request in more detail?

A. Her accommodation request was for intermittent or occasional work from home based on her medical disability, and we met, as I said, at the end of May and her accommodation was implemented by the end of June for that occasional work from home as-needed based on, in this case, weather conditions.

Q. Can you explain that more, what you mean by weather conditions and occasional or intermittent need to

work from home?
A. Yeah. The occasional work from home was based on the weather conditions because it was harder for her to be able to drive or see when it was overcast or cloudy or dark, especially during the winter months.
Q. And did that ever change into a full-time request to work from home?
A. Not during the life of my case, no.
Q. Thank you. No other questions.

STEPHANIE SILVA

BY MS. SATTERFIELD

Q. Stephanie, this is about topic 7 about plaintiff's meet expectations rating and how that affected her compensation. You were asked about how much her pay was reduced because she did not receive an exceeds rating for 2022 full year. Were there other reasons her pay was reduced beyond the rating?
A. Well, I think it's just several factors, like I said earlier, whether it's looking at company performance, line of business performance, personal performance, which would have included rating, and then also looking at terminating her against others

in similar type role and/or how the market pays for that role.
Q. Do you recall where her pay sat for 2022 compared to others on the finance division team?
A. Beth -- if memory serves me right, Beth was the fifth highest paid person in the commercial bank organization and that was inclusive of Steve Macko's directs.
Q. And was -- did you intend to testify that her pay was reduced solely because she received a meets rating in her evaluation for year-end that year?
A. No. Again, like I think it was several different factors that went into why her pay was decreased.
Q. And you were asked about plaintiff's pay for 2022 compared to 2021. I believe you said you could not recall the specifics. Do you agree with Steve Macko's testimony that her pay was actually increased in that year?
A. I believe he's probably right.
Q. And you heard the number that the variable compensation was reduced by 49,000 based on a chat. Do you recall that it actually ended up being much less than that, that was not the final number?
A. Right. I think that -- as I said, I don't recollect having that exchange, but that wasn't a

the report if she was technically out on leave.

STEVE MACKO

BY MS. SATTERFIELD

Q. Steve, this is for topic 7, the reason for assigning plaintiff a meets expectation rating for 2022. You wanted to explain why an evaluation could change between midyear and year-end and plaintiff's counsel refused to allow you to explain, so I'd like to give you the chance to do that.

MS. GESSNER: That's an improper characterization of the testimony. The record will speak for itself. I simply said you can ask the question. I did not refuse to allow you to do anything.

A. Sure. We rate our employees twice a year, at the midyear and at the year-end. Obviously we're not recommending or paying bonuses at the midyear. We only do that at year-end. From my experience, while the processes and the procedures are basically the same between the two periods, midyear and year-end, at year-end you have a full year's worth of performance to base your final decision on. That, coupled with making bonus

about those that were in senior roles, those were near the top in terms of total compensation, and we would have said -- a manager would have said I think this team member's an exceeds. Another manager might have said, interesting, based on what you've just described about their performance, that doesn't match how I think an exceeds would come out in -- in a rating. That's -- that's the whole notion of this calibration. You have to calibrate relative to the other team members in commercial banking so we feel like a meets equals a meets, exceeds equals an exceeds and those rating aren't different just because you have a different manager.

Q. And as to topic 8, you tried to explain several times the factors that went into compensation and evaluation ratings. Please provide the explanation.

A. Yeah. I think every -- every direct -- every manager at Jamey's level and at my level, we have a certain amount of dollars to work with. We get a budget that we can utilize to provide bonuses, total variable compensation to our team members, and both budgets are -- you know, they're tough year to year. You typically, you know, have to

make, you know, really tough decisions. Not everybody can be -- you know, make more every year, year after year, so you have to differentiate amongst team members.

I mean, I think the emails showed that in Jamey's initial cut he was way overbudget on the bonuses he was recommending relative to what he was given as a budget. So those would have naturally sparked some conversations around, well, where -- where -- where -- where -- where do we come in line with budget, Jamey.

Q. And you asked to see the final number of where Beth landed on her compensation in 2022, so I'm going to show you that. This is -- let me just get the Bates number before I start sharing because it blocked my screen. It is Wells Fargo 016439. And I do have it filtered just for Beth. Okay. So -- and I'll let you take time looking at it in whatever field you might need, so just tell me if there's somewhere you want me to slow down.

VIDEOGRAPHER: It's not up right now.

MS. SATTERFIELD: Oh, sorry. I forgot to share. Thanks for letting me know.

Q. (By Ms. Satterfield) Okay. Do you see the total TVC -- what does that stand for?
A. Total variable comp in common language is bonus.
Q. And what was the amount for Beth in 2022?
A. It was $195,000, and that's what would have been paid roughly in February or March of the following year of '23.
Q. Okay. And her total comp for 2022 was how much?
A. It was $425,000.
Q. What's your recollection of where -- where that fit on the team in terms --
A. She was -- she was -- I have clear recollection of that. She was the highest-paid team member in commercial banking finance who was not one of my direct reports, and she was fifth overall across all of commercial banking finance team members.
Q. And does this reflect -- does this refresh your recollection about for total comp the amount of the decrease from the year prior?
A. Yes. I think Ms. Gessner said 22 five. I said my recollection's actually a little bit worse. It's 25,000 or so, and what that reflects is the bonus was down $30,000. This file reflects that her compensation was down $30,000 in total, but we made a recommendation to increase her salary by 4,600,

contributors to the FP&A function.

Q. Why was Heather selected over Beth for that role?

A. Heather was ultimately selected because she was the most qualified candidate. She had the most knowledge of everything that the role requires. She also had the most strategic lens of the candidates that we looked at internally. In other words, these aren't just bean-counter roles. We ask our senior finance professionals to actually have a strategic lens to help the business think through the issues, how to address those issues with numbers, with data, with financials.

Q. Nothing further.

BY MS. GESSNER

Q. Mr. Macko, since you want to talk some more let's talk. You heard Mrs. Silva testify that Mrs. Arbuckle had been releveled three times. Her job was mitigated and changed three times in 2022, so in June of '22, then again in September of '22, and then in November of '22. Do you recall that testimony?

A. I do, Ms. Gessner.

Q. And each time Beth's position was de-elevated, meaning she was once a direct report and so she had