# Exhibit D

## Stephanie Silva Deposition Transcript

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No.: 3:24-cv-01068-FDW-SCR

BETH ARBUCKLE,

Plaintiff,

-vs-

WELLS FARGO BANK, N.A.,

Defendant.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _

VIDEOCONFERENCE DEPOSITION

OF

**STEPHANIE SILVA**

November 19, 2025

Charlotte, North Carolina

**Michelle S. Thompson**
**THOMPSON & MILLS COURT REPORTERS**
michelle@thompsonmills.com
**5425 Closeburn Road, Unit 311**
**Charlotte, NC 28210**
**704.564.5249**

not me. They designated you. Wells Fargo and the lawyers chose you for yesterday, not me. So again at no point in time during the deposition yesterday did you ask for a break that you did not get; true?

THE WITNESS: True.

Q. (By Ms. Satterfield) Stephanie --

MS. GESSNER: Do you have any other defamatory or slanderous questions you want to ask there, Stephanie Satterfield?

Q. (By Ms. Satterfield) Stephanie, could you explain the reorganization that occurred with Beth's team when direct reports from Beth's team and other teams were moved to report to Preeti Mone?

A. Yes. When the new GPL later came in, named Preeti Mone, there was a decision made that she would take pieces of the corporate and investment bank forecasting function -- not forecasting -- sorry -- balance sheet function, if I got that right, and then the commercial bank. So there were about seven people from Marc Winniford's team that moved to her, one person from Jamey, and I believe three FTEs from Beth and one open role from Beth to make up Preeti Mone's new team.

Q. What is Preeti Mone's new team -- what was the business reason for the change in the team structures?
A. Yeah. So she had recently been hired. It was a new role to support our business and she wanted to have the folks who supported the products report to her. That was agreed upon by Marc Winniford, and I think it was like LeRoy Davis and Steve Macko all agreed, so they moved -- they were moving those functions from each of those teams.
Q. And do you recall what the functions where that were moving from the various teams over into -- into the reporting chain for Preeti's organization?
A. I'm so nervous. I know I'm going to get the words wrong. I'm so sorry.
MS. GESSNER: Let the record -- let the record reflect that the witnesses is nervous with Mrs. Satterfield's questions.
A. I -- I believe it was -- I think -- oh, I'm going to say this wrong. The -- was it balance sheet forecasting.
Q. (By Ms. Satterfield) Deposit forecasting?
A. Yeah. Deposit forecasting.
MS. GESSNER: Objection, leading.

MS. SATTERFIELD: Objection to the form.
A. I wouldn't say that's true.
Q. (By Ms. Gessner) Let's do it again. Now why do you believe that Wells Fargo put into place the return-to-office reporting post-Covid?
A. To see how many people were coming back into the office.
Q. Why did they want to know how many people were coming back into the office?
A. So they can get an understanding of who is coming into the office.
Q. Now why would executive leadership need to know who was coming into the office?
MS. SATTERFIELD: Objection to the form.
A. I don't know exactly why they wanted it, but I think they wanted to see why people -- or if people were coming into the office or not post-Covid.
Q. (By Ms. Gessner) And why would they want to see whether people were coming into the office or not post-Covid?
MS. SATTERFIELD: Objection to the form.
A. To get an idea of if people were feeling

about the rest of this. Let's read it together quickly. Ms. Arbuckle did not outperform other employees' work by quality or overall contribution to the company.

Did I read that correctly?

A. Yes.

Q. I can't see your face with your hand --

A. Yes.

Q. She was appropriately rated as meets and provided a salary increase and discretionary bonus. Furthermore, Ms. Arbuckle has not and indeed cannot provide any evidence to prove a connection between her accommodation request and the reorganization of her department and her 2022 year-end performance rating without a connection to her claim of retaliation.

Do you see that?

A. Yes.

Q. And it's just the signature at the bottom, which you had already seen to begin with, correct?

A. Yes.

Q. Is this the first time you've read this document?

A. I believe so.

Q. And it is the document that the company sent to the government on behalf of Wells Fargo. Do you see

Q. (By Ms. Gessner) Again, there was a displacement date of June 13; true?
A. Originally, yes.
Q. All paperwork was done insomuch that all her systems were turned off June 13; true?
A. By a mistake, yes.
Q. Again, that was the date she was slated to be fired and all of her systems were turned off because that was the date she was slated to be fired; true?
A. No.
MS. SATTERFIELD: Objection to the form.
Q. (By Ms. Gessner) Ma'am, the date she was slated to be fired is the date she lost access to everything at Wells Fargo; true?
A. False.
MS. SATTERFIELD: Object to the form.
Q. (By Ms. Gessner) Ma'am, she was slated to be fired on June 13, 2023. Do we need to go back and pull out that email as well?
A. No. Remember, we said that it got pushed to July, and because of a mistake, that's what happened.
Q. I don't think you heard me. The date that she was slated originally to be fired was June 13, 2023;