# Exhibit F

## Steven Macko Deposition Transcript

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No.: 3:24-cv-01068-FDW-SCR

BETH ARBUCKLE,

Plaintiff,

-vs-

WELLS FARGO BANK, N.A.,

Defendant.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _

VIDEOCONFERENCE DEPOSITION

OF

**STEVE MACKO**

November 19, 2025

San Francisco, California


**Michelle S. Thompson**
**THOMPSON & MILLS COURT REPORTERS**
michelle@thompsonmills.com
**5425 Closeburn Road, Unit 311**
**Charlotte, NC 28210**
**704.564.5249**

for a witness.

MS. SATTERFIELD: You're misleading him based on --

MS. GESSNER: You just violated Rule 30. Again, you are -- you're going to be in really, really deep water with Judge Whitney. You have absolutely engaged in sanctional behavior for now a day and a half. Keep it up. We're going to show the Court that I just asked this witness a question; you answer it. That is against the rules. You need to stop.

MS. SATTERFIELD: I was saying you cannot mislead --

MS. GESSNER: Again, you -- I'm not misleading him.

Q. (By Ms. Gessner) Mr. Macko, did you understand my question that I just asked of you?

MS. SATTERFIELD: It was a 30(b)(6) deposition.

MS. GESSNER: It wasn't. That's not the question. He is a very smart person. He can understand. He can tell me if he doesn't understand. If you want to swear in and become a witness in this case I'm

happy to do that and conflict out Jackson Lewis.

MS. SATTERFIELD: I want the record to reflect that Michelle continues to scream at me and cut me --

MS. GESSNER: Keep it up because I'm not going -- and we are going to take this time back because I'm going to show the Court --

MS. SATTERFIELD: -- off and will not allow me to speak.

MS. GESSNER: -- absolutely that you have done nothing but obstruct. Counsel, counsel, are you --

Q. (By Ms. Gessner) Again, Mr. Macko, I hope you will go back to Wells Fargo and report that these lawyers who are paid by the hour have made this unnecessarily long to pad their own pocket, because they get paid by the hour, I do not, and here they are fighting and answering questions for you unnecessarily. We wouldn't even have to be here today but for all of those objections yesterday. So let me ask my question again.

Do you adopt the testimony that you heard yesterday from the company as your own in your

deposition today, yes or no?

MS. SATTERFIELD: Objection to the form, improper and misleading.

WITNESS: Ms. Satterfield, am I allowed to answer the question?

MS. SATTERFIELD: Yes.

WITNESS: Okay. Thank you.

A. Ms. Gessner, I was going to say before all -- before the back-and-forth I don't understand the question. This is my first time I've ever been deposed, so to adopt something, to me that's not terminology I -- I wouldn't know how to -- I don't understand the question, so I don't want to answer without understanding what I'm -- what I'm saying yes or no to.

Q. (By Ms. Gessner) And so let's make sure this record's clear. Before Mrs. Satterfield gave her speaking objection and answered for yourself, you were intending to ask for clarification; true?

A. I was going to say simply, Ms. Gessner, I don't understand the question.

Q. And you -- you're a smart guy; you know what you understand; you know what you don't; true?

A. I believe so, yes.

Q. All right. You heard the testimony of Mrs. Frakes;

do you remember that? Amy?
A. Correct. Yes.
Q. And Amy provided testimony on the company's policies among other topics; do you recall that?
A. I do.
Q. Is there any part of Mrs. Frakes' testimony that you believe that your testimony would be different?
A. She testified on a number of topics that I'm not as familiar with, so I can't imagine that my testimony would be different than hers, but it's pure speculation because I wasn't designated to speak on those topics and that's her field of expertise, not mine.
Q. I understand, but let me ask you then some clarifying questions. Do you believe that the company has an employee handbook?
A. Yes.
Q. Do you need to see it, the Exhibit 1 that was on the screen yesterday? Be happy to mark it again.
A. I saw it yesterday, Ms. Gessner.
Q. Are you familiar with the employee handbook?
A. Familiar, yes.
Q. Have you read it?
A. I can't answer when the last time is that I've read it in its entirety. I'm sure I've referenced it at

times over a 27-year career.
Q. Have you read the company's Americans With Disabilities Act policy?
A. I would have read anything that was provided in our annual trainings as part of our compliance requirements. I don't recall specifically reaching out for additional sources on that policy.
Q. Have you read the Americans With Disabilities Act policy in the employee handbook?
A. I don't recall.
Q. Have you read the FMLA policy in the employee handbook?
A. I don't -- I don't think so.
Q. In 2021 how many people did you have on your team, how many underneath you?
A. Just for clarification, Ms. Gessner, in 2021 I was in a different role, so I just want to make sure you're asking for --
Q. Yep.
A. I'd have to go back and look. I honestly can't remember.
Q. Do you have a range? Was it 50 people on your team?
A. No. It probably would have been a hundred and some change, similar to the number of team members that

Q. In 2025 what is the size of team that you manage today?
A. Today I manage four direct reports.
Q. And how many do they manage, so your entire team for which that you're the head of?
A. It's the same answer.
Q. Four, only four people?
A. Correct.
Q. And those four people do not have any direct reports?
A. Correct.
Q. And from 2021 to 2025 you have not read the employee handbook, ADA or FMLA policies, is that correct?
A. I have not.
Q. Have you read any of the retaliation policies in the employee handbook?
A. I have not.
Q. Now other than the lawyers, which I don't want to know about the content of conversations, have you spoken to anyone about the deposition yesterday?
A. Other than the lawyers?
Q. Yes, sir.
A. No. Actually, no. I told my boss I was going to be in a deposition, so he knew why I was blocked

towards the end of the deposition around how we calibrate and how we compare team members' performance to others on the peer group. That was what I recall wanting to bring up.

Q. (By Ms. Gessner) And I recall that testimony and we're going to talk about it in a bit, but you recall that Mrs. Satterfield asked you a long line of questions at the end of the deposition regarding that calibration and you were able to give a response to that. Do you recall that rebuttal?

A. I do, Ms. Gessner.

Q. And I believe that during that conversation -- and please correct me if I'm wrong; I want to make sure we have a clear record -- you claimed that part of the calibration process was looking across not only your enterprise but other enterprises to make sure that exceeds means exceeds and meets means meets across the organization. Is that an accurate assessment of what you said?

A. Across -- across my organization and across my direct reports, yes.

Q. When you were doing this calibration process that you testified about yesterday and you mentioned today, at any point in time did you consider and account for the fact that Mrs. Arbuckle had been

Q. So this Plaintiff's Exhibit 13 is accurate until such time that Mr. Escaler had moved on to a different role, and then the other change would be Heather Boucher took his role, correct?
A. I believe she officially started in that role in July of 2023.
Q. And do you recall there being an announcement of her promotion into that role on or around July 9, 2025?
A. Sorry. Let me just silence my phone.
Q. Do you need to take that?
A. No, thank you. I'm sorry. Would you repeat the question?
Q. Yeah. Do you recall that Mrs. Boucher's promotion was announced on or around July 9, 2023 -- I'm sorry -- 2023, July 9, 2023?
A. Yeah. That's correct, right around then. I had it as July 7, but maybe that was just her official start date. I can't remember.
Q. Prior to Mrs. Boucher taking the job and being announced that she was taking the job, there wasn't any kind of premeeting or preannouncement with the team; is that accurate?
A. I can't remember, Ms. Gessner, what -- what the announcement was. I don't think we did a big like

not big amounts, I think it makes the messaging a little less negative and the give-up from the pool is not material.

Do you see that?

A. I do.

Q. What was he talking about, the messaging a little less negative?

MS. SATTERFIELD: Objection to the form.

A. My interpretation from reading it now is that he suspected that Beth would have had a negative reaction to being down X dollars and making her a little less down might be more palatable is maybe the word that I would choose, but trying to think about how this bonus recommendation landed on Beth and how she would think about it. That's how I interpret that.

Q. (By Ms. Gessner) Because initially it was going to be 8.8 percent down, $40,000, and his recommendation was to dial that back $15,000 and only make it a $25,000 reduction; true?

A. Can you share that because I want to make sure that it's --

Q. It's on the screen. It's this section right here. He says total comp -- it says merit move from zero



Case 3:24-cv-01068-FDW-MTO Document 23-6 Filed 01/08/26 Page 11 of 22

to 4,600, so give her -- the initial plan was to give her no raise and here it was now give her two percent, 4,600, correct?
A. I see that now. Yeah.
Q. And the total variable comp would move from 125 to 200,000, correct?
A. Yep.
Q. And then total comp would be 430, which is down 5.5 percent, 25,000, from 2021, and total comp versus what we had, which was down 8.8 percent, 40,000, correct?
A. I see that. I see that.
Q. So he knew that if he went to Beth with zero merit increase and a $40,000 reduction, that the messaging was going to be negative, and that by giving her something it would be less negative; is that what you took and understand from this email?
A. I'd be making an assumption. If I may clarify one thing. Merit dollars, those that are available for raises, are different than bonus dollars, and they both have their own distinct budget that leaders have to work with. And so he may have had more budget under his merit pool and thus he suggested giving her a merit raise to offset some of the reduction in the bonus. That's how I think about

this email.

Q. And isn't it true that at Wells Fargo, when communications regarding comp occurs, that part of the communication is this is the percentage of raise you receive and here's what your bonus is, correct?

A. We started moving towards a here's your total compensation, but everybody does the math, what percentage was I up from last year. So we -- we can think about merit raise as percentages. It's very common to have a two percent year-over-year increase in base salary. Bonus percentages are all over the board, so we tend to communicate bonuses in absolute dollars and less so in percentages. But there was -- there was a time within Wells where it was tied to percentages. I've been here 27 years. I can't remember when that transition occurred, Ms. Gessner.

Q. And then you approve this math in the email exchange where you say, Hear ya on Beth. Let's take her to 195 incentive comp, and okay on the two percent.

So he wanted to move the incentive comp to 200 and you took her back to 195, correct?

A. Correct.

Q. And that the $10,000 back at Beth brings you right on budget.
Did I read that correctly?
A. Yes, you did.
Q. So you reduced the proposal by $5,000, correct?
A. I did.
Q. Why?
A. I was trying to get us to be on budget for Jamey's team. His proposal was still overbudget.
Q. At any point in time in these conversations that you had with Jamey did he remind you that Mrs. Arbuckle had been out on FMLA leave?
A. I don't recall, Ms. Gessner.
Q. Is that a he could have reminded you, you you don't remember, or you don't recall ever having a conversation with him about her FMLA leave?
A. Correct. Correct. He could have reminded me. I don't remember Jamey ever using FMLA. He could have reminded me that Beth was on leave, but I don't -- I don't have a recollection of him specifically saying she was on FMLA leave.
Q. Did he ever tell you at any point in time he didn't have enough data points in order to give her a fair evaluation?
A. I'm only reminded of that in the context of these

A. Let me clarify. Thank you for the clarification on what you're referring to. No, the budget was what he was budgeted on terms of dollars that he had to pay his team members bonuses and to give them raises. So the budget that he had, that reference to this bring you back to budget, has nothing to do with '23. That has to do with the pool of dollars that we had to determine people's bonuses for the full year 2022 that would be paid in February '23.
Q. Okay. So between November 29 and January 29, did anybody make a decision that your team needed to be cut immediately?
A. I can't remember somebody saying cut immediately. It's natural to recall that we would have been discussing how to be more efficient in 2023. We would have been discussing how to be on budget, different kind of budget, different from comp and salary increases. The total budget for commercial banking finance, all the money that we're going to spend on team members, personnel, salaries, travel and entertainment, whatever, so we would have been likely discussing that for the following year.
Q. So as of November 29, 2022, you don't recall any conversation about firing Beth with Mr. Escaler; true?

April 25, 2023, can you recall as you sit here today any communications whatsoever that you had with Mr. Escaler about firing Beth?
A. Not specific conversations, similar to the answer I previously provided.
Q. Do you remember anything generally?
A. Yeah. Generally we would have been talking about how he's going to meet his 2023 budget and how he's going to achieve that through hiring plans and displacements.
Q. Now, sir, you said we would have. What I'm asking is do you -- do you remember having a conversation with Jamey, so let me clarify that. You said I specifically do not remember having a conversation and I asked you generally. When I ask you the word do you generally, I'm still asking do you recall generally speaking to him about it as opposed to -- we would have infers that you don't know whether you did or you didn't, but it's something in your normal practice you would do. Do you understand the distinction between those two things?
A. Correct, Ms. Gessner. That's how I'm answering it.
Q. So let me make sure it's clear. Do you recall having any conversation with Jamey about firing Beth between February 14 and April 25, 2023?

Steph and Susan to meet. Do you recall whether you actually participated in this Teams meeting?

A. If I set it, it would have been common for me to attend. I don't have a recollection, but yeah, that's -- that's my invite and in all likelihood I did attend.

Q. Did you keep any notes or have any recollection of what you discussed on this date during this July displacement time sensitive?

A. I'd be guessing, Ms. Gessner, as to what we -- you know, what we decided or what we discussed on the call just based on the context of the prior emails, so I don't recall specifically.

Q. Did you tell Jamey to lie to Beth to tell her it was a mistake and that it was a system error as opposed to the fact that she was set and slated to be fired that day?

MS. SATTERFIELD: Objection to the form.

A. Ms. Gessner, I would not have told Jamey to lie, and I think it was an honest assessment that it was a mistake. She was not supposed to be terminated or noticed that day. That -- that was -- that was not good. That was a mistake.

Q. (By Ms. Gessner) Okay. This is the exchange that

instruction when I gave it to you, didn't you?
A. Yes and yes.
Q. And yes -- what is your answer to my question do you recall --
A. Yes.
Q. -- having communications about Mrs. Arbuckle with legal?
A. Yes.
Q. I have no further questions at this time. Thank you.
A. Thank you.

BY MS. SATTERFIELD

Q. Steve, I just have a few follow-up questions on reexam. You -- you suggested in your testimony earlier today that you were not as clear on FMLA laws prior to these depositions. To your knowledge, did Beth's FMLA leave negatively affect her year-end 2022 performance rating?
A. That's not my recollection.
Q. And from your personal knowledge and involvement in that process, was her leave a consideration at all for you in assigning her a meets evaluation instead of exceeds for year-end 2022?
A. Not really, I mean only in the context that the



Case 3:24-cv-01068-FDW-MTO Document 23-6 Filed 01/08/26 Page 18 of 22

commentary that Jamey made, right, so at the time I don't remember that being consideration. It's hard in my head to differentiate between everything that I've absorbed in the last, you know, 24 hours, but no.
Q. And to your knowledge did Beth's FMLA leave negatively influence her compensation for year-end of 2022?
A. That's not my recollection.
Q. And was her leave a consideration at all for you in how you set Beth's year-end compensation in 2022?
A. No. The compensation was tied to how we viewed her overall performance relative to peers. And we talked about it yesterday, but the value of the seat compensation wasn't specifically just tied to Beth. We were at the time working through what is the seat worth, so do you -- what should compensation levels look like for certain roles, for certain activities, and that would have occurred outside of how Beth performed in that role.
Q. And was Beth's work-from-home accommodation a factor in either her receiving a meets or her compensation decision in 2022?
A. It shouldn't have been.

Q. For you was it a factor?
A. No.
Q. What was the guided ratings distribution for performance evaluations in 2022 for your team for finance division?
A. Would have been the same for all teams, five percent consistently exceeds; 15 percent exceeds; 60 percent meets, so the vast majority of people on the team get a meets rating; 15 percent inconsistently meets; five percent needs improvement.
Q. Were there others in the finance division reporting up to you that were rated a meets at year-end after receiving an exceeds evaluation in the midyear evaluation?
A. Say that again.
Q. Were there others in the finance division reporting up to you that were rated a meets at year-end in the 2022 year-end evaluation after receiving an exceeds in the midyear 2022 evaluation?
A. I believe we did have some other team members that went from an exceeds to a meets at year-end.
Q. Were there others in the finance division reporting up to you who had total compensation decreased in 2022 to your knowledge?

A. Yes.
Q. And could you explain the reasons for the reorganization in fall of 2022 where the finance team was created to support Preeti's function?
A. Yeah. At that time the decision was made to create a role in finance to oversee everything that has to do with our global treasury management business, and so they created a role for someone to lead the GTM finance function. Deposits are very much core to our treasury management business, and so while Beth had the loan and deposit forecasting team, the decision was made to move the deposit part of that team over to Preeti Mone. Preeti Mone was no longer going to report to me and Marc Winniford, if I recall correctly.
Q. Was there a particular function that Preeti was looking to move to report up to Preeti for the products?
A. Say that again.
Q. Was -- was -- was there a particular function that Preeti was looking for to build a finance team reporting up to her?
A. I don't recall.
Q. Do you know if other managers had team members who were moved from direct reports to those managers to

under Preeti's team as part of this reorganization?
A. There were. I can't remember who or how many, but there were others that also moved into her team to support that new GTM function.
Q. To your knowledge was Beth's leave or work-from-home accommodation a factor in this reorganization?
A. No, shouldn't have been. I don't remember anything about that being a factor.
Q. I don't have any further questions.

BY MS. GESSNER
Q. Mr. Macko, I've got more questions. So earlier you testified that based upon what you've seen over the last two days that you understand why Beth believes that she was discriminated and retaliated against. Do you recall that testimony?
MS. SATTERFIELD: Objection to the form.
A. Yeah, I recall a version of that form, Ms. Gessner. I don't remember if those were the specific words that I said I could see how she would feel that way, but yes, I do recall that testimony.
Q. (By Ms. Gessner) And so this case is headed to trial because a jury decides who's telling the truth. So my question to you is, are you going to