# Exhibit G

## Jamey Escaler Deposition Transcript

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No.: 3:24-cv-01068-FDW-SCR

BETH ARBUCKLE,

Plaintiff,

-vs-

WELLS FARGO BANK, N.A.,

Defendant.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _

VIDEOCONFERENCE DEPOSITION

OF

**JAMEY ESCALER**

November 20, 2025

New York, New York

**Michelle S. Thompson**
**THOMPSON & MILLS COURT REPORTERS**
michelle@thompsonmills.com
**5425 Closeburn Road, Unit 311**
**Charlotte, NC 28210**
**704.564.5249**

A. I have not seen this document before.
Q. Okay. I'm going to direct you to just one section of this Plaintiff's Exhibit 3 and see if you recall a discussion. So here in the middle of the page -- I'll be happy to blow it up so you can see it further -- it says that Mrs. Arbuckle met with Mr. Escaler on January 20, 2023, for her annual performance review. Do you see that?
A. Uh-huh.
Q. Do you -- is that a yes?
A. Yes, yes, that is a yes.
Q. Do you remember meeting with Mrs. Arbuckle on January 20, 2023, for her performance review?
A. I remember meeting with Beth for her performance -- for year-end performance review in January. I don't know if it was exactly on the 20th, but it would have been -- likely have been in January.
Q. Do you have any reason to dispute that it was January 20?
A. I -- other than the fact this is January 2023, so two and three-quarters years ago, I have no reason to dispute that it is on January 20.
Q. Okay. And Mrs. -- you later -- a week later on January 27 you met with her again to discuss her compensation. Do you see that in the letter?

A. I do see that in the letter, yes.
Q. Do you know that you met with Mrs. Arbuckle on January 27, 2023, to discuss her compensation?
A. It could have been -- it could have been a virtual meeting. It could have been a virtual meeting. I can't remember if was it an in-person meeting.
Q. Sir, sir, it doesn't say in person. My question was very specific.
A. So -- so yes. So -- so -- so --
Q. Hold on, hold on, let me finish. Hold on. You're talking over me again. I asked you specifically do you -- on the screen on Plaintiff's Exhibit 3, I'm just trying to -- I'm just trying to get you to read along with me and let me know if you disagree with these dates.
A. Yeah. I --
Q. The second one -- the second one is a week later on January 27 you met with her to discuss her compensation.
I don't care whether it was virtual or in person. My question to you is do you recall having some meeting with Mrs. Arbuckle on January 27, 2023, to discuss her compensation?
A. I -- I remember that subsequent to the -- to the review there would have been a discussion on

compensation, which is how it happens for every other employee at Wells Fargo.

Q. Was there anyone else other than you and Mrs. Arbuckle in either of these meetings on January 20 or January 27?

A. No. That was just me and Beth, which is how a hundred percent of reviews and compensation discussions occur at Wells Fargo.

Q. Did you keep any audio or video recordings of either of these meetings?

A. Because the policy -- the internal policy of Wells Fargo is to not record any meeting, there are no audio recordings of that meeting.

Q. Sir, I don't need the policy. I just need a yes or a no. Okay? I don't need to know what the policy is. I just need to know if you did it or you didn't do it. Okay?

A. There -- there are no recordings, Michelle.

Q. Did you keep any written notes of what the two of you discussed during either of these meetings?

A. The substance of the meetings would have been captured in the written performance review and the written -- in the written compensation statement.

Q. Okay. Beyond the written performance review and the written compensation statement, did you keep

any other notes of either of these meetings with Ms. Arbuckle?
A. I did not.
Q. Now do you recall during the meeting that Mrs. Arbuckle expressly asked you what had happened between her midyear review and the end of the year that impacted her rating so dramatically as reflected in Plaintiff's Exhibit 3 on the screen?
MS. THOMPSON: Objection, form.
A. Yeah. I remember Beth asking about her meets rating.
Q. (By Ms. Gessner) Okay. Tell us everything you can recall about Beth asking about her meets rating.
A. Okay. So going back two and three-quarter years, I imagine that the question would have been around what -- what changed between the midyear rating and the -- sorry -- the first half of 2022 and the second half of 2022.
Q. Anything else that you can recall about the discussion with Beth regarding her rating?
A. Well, I -- I'm -- I'm sure -- well, actually I'm not sure. I can't recall anything else specifically about that meeting.
Q. Do you recall anything generally?
A. Yeah. I mean, I think generally I'm sure that I

would have discussed the rating scale at Wells Fargo. Right? So a meets rating, for context, is given to Wells Fargo employees that fully meet the expectations of their role and are valued contributors to the firm. Right? 60 percent of everybody at Wells Fargo has a meets rating and it is a --

Q. Hey, sir, sir, let me -- sir, sir, sir, sir, sir, wait a minute.

A. Michelle, you asked -- you just asked me a question and now you're not letting me answer the question.

Q. Okay. I appreciate that.

MS. THOMPSON: Michelle, you're cutting him off.

Q. (By Ms. Gessner) What's happening, Mr. Escaler, is I don't need to know anybody else. We're here -- let me ask. You know you're here today to only discuss Beth Arbuckle?

MS. THOMPSON: Objection, form, and, Michelle, please stop cutting him off when he's answering your questions.

Q. (By Ms. Gessner) Okay. Again, Mrs. Thompson or Ms. Satterfield can ask you all the questions they want when I'm done, and if you want to explain every single element of everything that happens at Wells

A. I don't know. Didn't take -- didn't take notes. Didn't correctly take notes, you know, misheard what I said, misheard what I said. Right? Mixed up another -- the answer to another question. I guess there are a million reasons why it might not be correct.
Q. (By Ms. Gessner) Any others? Any other reasons that you think Jason Manuel would not accurately report what you told him when he interviewed you about Mrs. Arbuckle?
MS. THOMPSON: Objection, form.
A. Yeah. I -- okay. So this part is also not completely accurate. So after the ratings had been reviewed and discussed, Steve then informs me on what the final ratings will be, which is -- that's not -- that's not entirely accurate. It would have been discussed -- the ratings would have been discussed in a group setting with Steve and his direct reports, so it would have been a -- you know, some sort of like consensus decision with -- with Steve, HR, his directs. That's how ratings are -- that's how ratings are determined. They're collectively determined.
Q. Okay. Anything else?
A. Well, there you go. I actually said it afterwards.

A. It doesn't seem accurate because I think Preeti asked that -- I think asked to have the deposit team consolidated into her team in August, so the September date feels off. Also the characterization of a proposal also not accurate. I think what I asked for was a couple of bullets or a slide, but the rest seems accurate.
Q. Now do you recall that when you were asking Mrs. Arbuckle to prepare what you call bullets or a slide, she was on family medical leave; true?
A. She was on family -- family medical leave, that is correct.
Q. So while she's on family medical leave you contacted her and asked her to prepare --
A. The words were bullets or a slide. Yeah.
Q. Why did you contact her while she was on family medical leave asking her to work?
MS. THOMPSON: Objection, form.
A. Yeah, I wasn't really asking Beth to work. I was asking really for Beth's thinking on the points we wanted to make on the advantage of keeping the deposit team under Beth.
Q. (By Ms. Gessner) You and Beth Arbuckle are not personal friends; true?
A. Beth -- Beth Arbuckle and I are not personal

friends.
Q. In fact, you don't even live in the same town; true?
A. We don't live in the same town.
Q. And you at the time of making a call to her in August or September or 2022 you were her boss, correct?
A. That is correct.
Q. And you are asking her to use her brain on behalf of Wells Fargo to help you with something; true?
MS. THOMPSON: Objection, form.
A. I was reaching out to Beth Arbuckle to, yes, get her perspective on the advantages of keeping the deposit team under Beth.
Q. (By Ms. Gessner) And you asked her to prepare slides or bullet points, correct?
A. A few bullet points or a slide or two. Yeah.
Q. In the two paragraphs that you just read on Plaintiff's Exhibit 4, Wells Fargo 9 and 10, is there anything about these two paragraphs that is false or inaccurate?
A. So yeah. So this sentence, this last sentence, first paragraph, top page, The new head of GTM finance identified the deposit forecasting team that at the time was sitting under Arbuckle, Davis

indicating that -- on February 14 indicating that you wanted to eliminate Beth's position; true?
A. No. I put the role of treasury senior manager on the list of potential -- the list for potential displacement.
Q. Sir, just so again the timeline is clear, February 14, 2023, is before June 23, 2023, correct?
A. That is correct. February precedes the month of June.
Q. At some point you became aware that Mrs. Arbuckle was going to be fired; true?
MS. THOMPSON: Objection, form.
A. I wasn't made aware that Beth Arbuckle was going to be fired because Beth Arbuckle was never fired or --
Q. (By Ms. Gessner) Sir, that wasn't my question. At some point you made -- you were made aware that Mrs. Arbuckle was going to be fired on June 13, 2023, correct?
MS. THOMPSON: Objection, form.
A. I -- I wasn't -- I was never informed that Beth Arbuckle was going to be fired because Beth Arbuckle was never going to be fired.
Q. (By Ms. Gessner) All right. Let's look at **Exhibit 10** for the depositions. Do you see the document on

correct?

MS. THOMPSON: Objection, form.

A. The potential date that she would be notified would be -- had been moved to July.

Q. (By Ms. Gessner) Sir, it doesn't say the potential date, does it?

A. Well, it's -- Michelle, since it was June further down in the email and now it's July, that's -- that would -- that would imply it's a potential date.

Q. The word potential is nowhere in those dates, correct?

A. The fact that the date is not consistent between June and July would -- would -- would imply it's a potential date.

Q. On June 13, 2023, at 12:54 p.m., you were notified that Beth's system access, credit card and badge access had been turned off; true?

A. I -- yes, I was made aware that there was some sort of system issue. Beth made me aware. Steph made me aware. It apparently impacted like hundreds of Wells Fargo employees, and I -- I didn't know what was causing it, but I do know it did impact Beth.

Q. All right, sir. We'll let the jury decide whether what you just said is truthful or not, but let's move on. On June 13, 2023, was the original date

that Beth was supposed to be terminated, correct?

MS. THOMPSON: Objection, form.

A. Could you restate the question, Michelle?

Q. (By Ms. Gessner) June 13, 2023, was the original date that Mrs. Arbuckle was supposed to be terminated, correct?

A. Not correct. June 2023 was the date that Beth would be notified -- would be notified -- the potential date that Beth would be notified that the role of treasury senior manager would be eliminated.

Q. Sir, look at Plaintiff's Exhibit 10 that is on the screen. It directly contradicts the testimony that you just gave, so I'm going to give you a chance to correct it instead of perjuring yourself. It expressly says from you at 12:54, you had confirmed that Beth’s displacement was moved to July, period. Today was the original displacement date. And --

A. Correct.

Q. -- it looks like technology still proceeded with removing Beth's access.

A. Yes, that's a -- yeah, so, Michelle --

Q. Sir, let me ask you a question. Stop talking over me. Did I read those three sentences correctly?

MS. GESSNER: Objection, form, and

Q. Just read it to yourself -- just read it to yourself and say yes or no whether you see anywhere on this document those words.

MS. THOMPSON: Objection, form, and argumentative.

A. There is -- there is not in this email notification to Beth that her role had been placed on the list for potential displacement.

Q. (By Ms. Gessner) Do you see the email that is Bates number 4665 that is on the screen, another email from you on June 14, 2023, at 11:03 a.m.?

A. I -- I see the email.

Q. Do you see anywhere on this email informing Beth of the truth that you had decided to fire her on June 13, 2023, that caused her system to be disconnected?

A. Beth was never on a list to be fired.

Q. Sir, do you see anywhere on this email that you told Beth or anybody the fact that you had slated her to be fired on June 13, 2023, yes or no?

MS. THOMPSON: Objection, form.

A. Beth was -- Beth was never slated to be fired.

Q. (By Ms. Gessner) Sir, you're not -- do you not -- what part of my question did you not understand?

MS. THOMPSON: Objection, form.

A. It would appear from this email that -- that -- that June 14 was the date.
Q. At no point in time did you ever tell Mrs. Arbuckle the truth about the decision to fire her, correct?
MS. THOMPSON: Objection, form.
A. Well --
Q. (By Ms. Gessner) Sir, it's a very simple question. It's a very simple question. They can use their time to ask you other questions, but my question is very simple. Let me say it slowly and clearly. At no point in time did you inform Beth Arbuckle that she was going to be fired when her system was turned off on June 13, correct?
MS. THOMPSON: Objection, form, and argumentative.
A. Beth -- yeah. Beth was never on a list to be fired, Michelle, so there would have been --
Q. (By Ms. Gessner) All right. Mr. Escaler, do you -- this case is going to go to trial in May of 2026. I understand you live in New York, correct?
A. That is correct, Michelle.
Q. And will you be traveling to Charlotte, North Carolina, to appear as a witness at trial?
MS. THOMPSON: Objection, form.
A. If -- if -- if my attorneys suggest it, sure.

Q. (By Ms. Gessner) At this time I have no further questions.

BY MS. THOMPSON

Q. I just have one question for redirect, Jamey. Earlier you were discussing the January 20 meeting with Beth and you were answering the question and said generally what you would have discussed with her, and I think you were saying something about a meets rating. Can you elaborate on that?

A. Yeah. So, you know, a meets rating is a good rating, and people who -- you know, many -- many -- you know, when we have reviews we often talk about like what ratings mean. A meets rating is the rating that 60 percent of the firm -- the employees at the firm get. It is a good rating. It is a rating that is meant to reflect that an employee is fully delivering, meeting the expectations of their role, and that they are a valuable contributor to the success of Wells Fargo.

Did that answer your question, Florence?

Q. Yep. That's all.

MS. GESSNER: I do have some other questions, but let's take five minutes. I need to pull together some documents,

A. I haven't seen any emails, but that doesn't mean that they do or do not exist.
Q. (By Ms. Gessner) All right. Let's talk a little bit about between November 2022 and the end of January 2023, so we're talking two months, including after Thanksgiving but before January 27. Okay?
A. Uh-huh.
Q. Just those two months. Do you have this timeframe -- do you understand the timeframe I'm talking about?
A. So November was when we review -- review calibration, compensation calibration. January is when reviews were delivered to all the team members for Wells Fargo. January would have been the timeframe that all the compensation discussions would have happened, so I do recall the bookends.
Q. Okay. So sitting here today can you think of a single event that happened between November -- end of November 2022 and end of January 2023 that required you to fire Beth Arbuckle?
MS. THOMPSON: Objection, form.
A. Yeah. I -- I was never required to fire Beth Arbuckle and I never fired Beth Arbuckle.
Q. (By Ms. Gessner) That wasn't my question, sir. Can

A. So I know with certainty that between November and January relative to the same period the prior year the treasury senior manager role would have been narrowed in scope as the result of the deposit team moving to Preeti Mone's organization, making the role of treasury senior manager redundant.
Q. Anything else?
A. Well, I can't remember when Santo asked Steve to find $2 million of savings, but that obviously would have also factored into the equation of coming up with candidates or roles for potential displacement, so -- but that is -- that is probably findable, right, that $2 million ask from Santo is findable.
Q. What is your current total compensation?
A. My current -- my current --
WITNESS: Florence, is that even relevant to this conversation?
MS. THOMPSON: It's not, but you can answer.
Q. (By Ms. Gessner) You're required to answer it, sir.
A. Okay. So my current compensation -- I don't exact -- the exact number for 2024, right, which is obviously what you're talking about, but it would be somewhere north of $400,000.